**ELVIS PRESLEY ENTERPRISES, INC., Plaintiff,**

v.

**Barry CAPECE; Velvet, Ltd., a Texas Limited Partnership; and Audley, Inc., a Texas Corporation, Defendants.**

**Civil Action No. H–95–1197.**

United States District Court, S.D. Texas, Houston Division.

Dec. 30, 1996.

W. Mack Webner, Cynthia Clarke Weber, Sughrue Mion Zinn MacPeak and Seas, Washington, DC, for Elvis Presley Enterprises, Inc.

Wayne D. Davidson, Wayne D. Davidson & Associates, Houston, TX, Terry Fitzgerald, Fitzgerald Gartner & Follis, Houston, TX, William Dean Raman, Arnold White & Durkee, Austin, TX, John Paul Venzke, Houston, TX, for Barry Capece, Velvet Ltd., Audley, Inc.

## ORDER

GILMORE, District Judge.

On the 25th day of November, 1996, the above-styled and numbered case came on for trial. Both sides appeared and announced ready for trial, and the case was tried to the Court from November 25 to November 26, 1996. At the conclusion of Plaintiff's case in chief, Defendants moved for judgment as a matter of law as to Plaintiff's claims. Defendants' motion was denied. The Court enters the following findings of fact and conclusions of law on the evidence presented.

## I. BACKGROUND

Elvis Presley Enterprises ("EPE") is a Tennessee corporation formed in 1981 under the terms of a testamentary trust created by Elvis Presley ("Presley"). EPE is the assignee and registrant of all trademarks, copyrights, and publicity rights belonging to the Presley estate, including over a dozen United States federal trademark registrations and common law trademarks of Presley's name and likeness. None of these marks, however, are registered service marks for use in the restaurant and tavern

business. EPE's exclusive rights are marketed through a licensing program which grants licensees the right to manufacture and sell Elvis Presley merchandise worldwide. Products range from t-shirts to juke boxes. Merchandise sales have generated over $20 million dollars in revenue in the last·five years and account for the largest percentage of EPE's annual earnings. In addition, EPE operates a mail order business and several retail stores at Graceland, the Elvis Presley home in Memphis, Tennessee, including two restaurants and an ice cream parlor. EPE recently announced plans to open an Elvis Presley night club in 1997 on Beale Street in Memphis and is also currently exploring the possibility of opening similar establishments throughout the world.

In April of 1991, Barry Capece ("Capece"), operating through the now dormant limited partnership, Beers 'R' Us, opened a nightclub on Kipling Street in Houston, Texas named "The Velvet Elvis." The name, "The Velvet Elvis," referring to one of the more coveted velvet paintings, was selected for the powerful association it immediately invokes with a time when lava lamps, velvet paintings, and bell bottoms were popular. Capece intended the bar to parody an era remembered for its sensationalism and transient desire for flashiness. By taking bad, albeit once widely popular, art and accentuating it with gallery lights and by showcasing decor which mocks society's idolization of less than scrupulous celebrities, Capece ridiculed a culture's obsession with the fleeting and unimportant. His biting criticism provides his patrons with a constant reminder not to take themselves nor the world they live in too seriously.

In·order to register the new bar's name, Capece filed a federal service mark application with the United States Patent and Trademark Office (PTO) on August 28, 1991. In December of 1992, pursuant to § 12(a) of the Trademark Act of 1946, the service mark was published in the Official Gazette of the Patent Office· for the purpose of providing notice of the mark's pending registration and an opportunity for parties to object to the application's approval. Although aware of the service mark's publication in the Official Gazette, EPE did not file an opposition to the mark within the proscribed thirty day period. On March 9, 1993, registration for the service mark, "The Velvet Elvis," was issued to Capece for use in the restaurant and tavern business. For business reasons, however, the Kipling Street nightclub was closed in July of 1993.

Shortly thereafter, Capece began soliciting investors and quickly obtained the financial backing to reopen "The Velvet Elvis" at a different location. Another limited partnership, Velvet Ltd., comprised of general partner, Audley, Inc. and three limited partners, was formed to replace Beers 'R' Us as "The Velvet Elvis'" new owner. With the necessary funds in hand, Capece leased a vacant sports bar on Richmond Avenue and began renovation in January of 1994. In July of that same year, EPE sent a cease and desist letter to Capece, threatening legal action if the bar opened with EPE's trademark, "Elvis," in its name. Capece was "All Shook Up." Despite the warning letter, however, the Richmond Street "Velvet Elvis" opened for business in August of 1994.

The bar currently serves a wide selection of liquors, including premium scotches, bourbons and tequilas. Food is available and menu items range from appetizers to complete entrees. "The Velvet Elvis" also claims to be the first cigar bar in Houston, specializing in high quality cigars. "The Velvet Elvis's" decor, consistent with its theme, features velvet paintings along with a widely divergent assortment of eclectic art. In addition to the velvet Elvis painting in the back lounge, velvet portraits of Stevie Wonder, Chuck Berry, Bruce Lee, and a collection of velvet nudes are hung throughout the bar. Also a part of the bar's decor are lava lamps, cheap ceramic sculptures, beaded curtains, and vinyl furniture. A painting of the Mona Lisa exposing her breasts hangs prominently in the front room. Centerfolds from Playboy magazines dating back to the sixties completely cover the walls of the men's room. Reminders of Elvis Presley, including numerous magazine photographs and a statute of Elvis playing the guitar, were at one time amongst the bar's decorations, but have since been replaced with art work unrelated to

Elvis or his music but equally as reminiscent of the forgotten era the bar attempts to mimic.

Pictures and references to Elvis Presley were also used in advertisements promoting the establishment until 1995. A number of ads contained actual pictures of Elvis Presley. Some ads made direct references to the deceased singer or Graceland using phrases such as "The King Lives," "Viva la Elvis," or "Elvis has *not* left the building." Others, while avoiding explicit references to Elvis or his persona, boldly displayed the "Elvis" portion of "The Velvet Elvis" insignia with an almost unnoticeable "Velvet" appearing alongside in smaller script. The bar's menu bears a caption, "The King of Dive Bars." A frozen drink, "Love Me Blenders," is served in the bar and the menu features items such as peanut butter and banana sandwiches, and "Your Football Hound Dog."

Plaintiff claims that the focal point of the bar's name, decor, and advertisements is Elvis Presley. To protect its exclusive right to license the commercial use of Elvis Presley's name, image, and likeness, Plaintiff filed suit against the Velvet, Ltd., Audley, Inc., and Capece, as owner of "The Velvet Elvis" service mark, on April 21, 1995. Plaintiff sued Defendants for unfair competition, trademark infringement, and dilution, under both the common law and the Lanham Act, 15 U.S.C. § 1051 et seq. (1994), and for infringement of its common law and corresponding statutory right of publicity. Plaintiff seeks injunctive relief, an accounting for profits, attorneys fees, costs, and an Order to the Commissioner of Trademarks to cancel Capece's registration for "The Velvet Elvis." [1]

Defendants, on the other hand, maintain that Plaintiff is merely a victim of "Suspicious Minds." Defendants contend that its valid, registered service mark presumptively entitles it to the exclusive right to use the mark in its business. Further, because the bar is meant and viewed as a parody, Defendants also argue that use of its service mark has not yet nor will in the future cause confusion as to the identity of the bar's own-

ers, sponsors, or affiliates. Defendants claim that all possibility of confusion or dilution of Plaintiff's trademarks is negated with the customer's immediate appreciation of the bar's parodic message. Defendants also assert that their parody is protectable expression under the First Amendment, further warranting the Court's dismissal of all Plaintiff's claims. Alternatively, Defendants argue that to allow Plaintiff to succeed in this suit after its inexcusable delay in asserting opposition to Defendants' use of "The Velvet Elvis" as a service mark would result in extreme prejudice to Defendants and, consequently, that this action is subject to the equitable defenses of laches and acquiescence.

## II. UNFAIR COMPETITION AND TRADEMARK INFRINGEMENT

Liability in this case will depend on whether Defendants have improperly utilized the Elvis moniker or Elvis's image and likeness in the promotion and operation of its tavern. Stated simply, the Court must determine whether Defendants stepped on Plaintiff's blue suede shoes. Plaintiff claims the inclusion of its "Elvis" trademark in the service mark "The Velvet Elvis" coupled with Defendants' use of the image and likeness of Elvis Presley in advertising, promoting, and rendering bar services creates confusion as to whether EPE licensed, approved, sponsored, endorsed or is otherwise affiliated with "The Velvet Elvis," constituting unfair competition and trademark infringement under the common law and Lanham Act.

To prevail on its trademark infringement and unfair competition claims under the Lanham Act, Plaintiff needs to demonstrate that Defendants' use of "The Velvet Elvis" service mark and the image, likeness, and other indicia of Elvis Presley was likely to cause confusion in the mind of the ordinary consumer as to the source, affiliation, or sponsorship of Defendants' bar. *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 149 (5th Cir.1985); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th

---

**1.** Although Plaintiff's petition also included a claim for damages, no evidence of damages was presented at trial. Plaintiff argued only for injunctive relief and cancellation of Capece's service mark.

Cir.1980) *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). The focus is whether a defendant's use of a mark and image creates a " 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 502 (2d Cir.1996) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *see also Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 594 (5th Cir.1985) (holding that likelihood of confusion is the central issue in any suit for trademark infringement or unfair competition). Liability is established if the evidence demonstrates that consumers will mistakenly believe the goods or services in dispute actually originated with the plaintiff or if it appears that plaintiff may have sponsored or otherwise approved of defendant's use. *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 789 (E.D.N.Y.1983); *see also Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir. 1975) (finding trademark infringement where a defendant uses a mark that falsely suggests affiliation with a trademark owner in a manner that is likely to cause confusion as to source of sponsorship). The governing standard for common law trademark infringement and unfair competition is the same "likelihood of confusion" test applied to claims brought under the Lanham Act. *Universal City Studios, Inc. v. Kamar Industries,* 217 U.S.P.Q. 1162, 1167, 1982 WL 1278 (S.D.Tex.1982).

■ Although the standards are similar, there is a fundamental distinction between trademark infringement and unfair competition. *See Professional Golfers Ass'n of America,* 514 F.2d at 671. Trademark law is based on a relatively narrow principal as compared to its frequent companion unfair competition—its goal is to provide the holder of a trademark the exclusive right to use a phrase, word, symbol, image, or device to identify and distinguish his product. *Jean Patou, Inc. v. Jacqueline Cochran, Inc.,* 201 F.Supp. 861, 863 (S.D.N.Y.1962), *aff'd,* 312

F.2d 125 (2d Cir.1963); *see also* 15 U.S.C. § 1114. Unfair competition, on the other hand, is more encompassing. "[A] claim of unfair competition considers the total physical image given by the product and the name together." *Jean Patou, Inc.,* 201 F.Supp. at 863. "[E]very facet of the parties' selling program is relevant—from the symbols, letters, pictures, colors, shapes, and sizes connected with the products to the advertising representations made." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 2.02 (3d ed. 1992); *see also* 15 U.S.C. § 1125(a). Due to this difference, there may be some instances where "a defendant is guilty of competing unfairly without having technically infringed." *Professional Golfers,* 514 F.2d at 671.

In this circuit, courts have relied on the following list of factors in determining whether a defendant's use of a mark or image creates a likelihood of confusion:

(1) the type of trademark alleged to have been infringed;

(2) the similarity of design between the two marks;

(3) the similarity of the products or services;

(4) the identity of the retail outlets and purchasers;

(5) the identity of the advertising medium utilized;

(6) the defendant's intent; and

(7) evidence of actual confusion.

*Conan,* 752 F.2d at 149; *see also Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975). This list is neither exhaustive nor exclusive. In fact, "[t]he absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported by even a majority of the seven factors." *Conan,* 752 F.2d at 150. Further, the Court is not limited to the factors enunciated in *Conan* to determine likelihood of confusion and is free to consider other relevant evidence of confusion. *Armco, Inc. v. Armco Burglar Alarm Co., Inc.,* 693 F.2d 1155, 1160 (5th Cir.1982). An additional factor that impacts the analysis in this case is whether Defendants' attempt

to parody the Elvis era and the eclectic bars of the sixties successfully eliminated the potential for a customer to be misled or whether it simply increased the likelihood of confusion. *Nike v. "Just Did It" Enterprises,* 6 F.3d 1225, 1228 (7th Cir.1993) (holding that parody is not an affirmative defense to trademark infringement and unfair competition claim but can be an additional factor in analyzing the likelihood of confusion); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1485 (10th Cir.1987) (considering the product's use as a parody to be a factor weighing against the finding of a likelihood of confusion).

■ At the outset, Defendants plea, "Don't be cruel, we have a registered service mark." The length of the time the mark "The Velvet Elvis" has been used continuously in commerce will impact the deference accorded to the PTO's issuance of the registration. In its evaluation of each application submitted, the PTO employs the same "likelihood of confusion" test used by courts in infringement actions. *See* 15 U.S.C. § 1052; *see also* McCarthy, *supra,* § 23.24. Generally, the PTO will issue a registration upon concluding that the purchasing public would not assume mistakenly that the applicant's goods or services originate from or are sponsored by another registered trademark holder and after an appropriate period for opposition to the pending application. *See* McCarthy, *supra,* § 23.24[1][a].

Proof of registration of a service mark with the PTO is *prima facie* evidence of the validity of the mark and the registrant's exclusive right to use the mark in commerce for the services specified in the registration. 15 U.S.C. § 1115(a). Such proof, however, is not irrefutable and in the appropriate circumstances can be defeated by any legal or equitable defense which may have been asserted had the mark not been registered. *See* 15 U.S.C. § 1115(a). Ownership of a registered mark becomes conclusive evidence of the holder's exclusive right of use, subject to the few defenses under 15 U.S.C. § 1115(b), only after it has been used continuously in commerce for five consecutive years. As this is not the case here, the Court will determine whether Plaintiff's evidence is sufficient to sustain its burden of rebutting Defendants' presumptive right to use "The Velvet Elvis" service mark in its business. The Court will first analyze whether Defendants' use of the Elvis name in its service mark and Elvis memorabilia as bar decor is likely to create consumer confusion. Defendants' employment of the image, likeness, and other indicia of Presley in advertisements will be addressed separately.

## A. Service Mark and Bar Decor

### 1. Type of Trademark (Strength of the Mark)

The "type" of trademark refers to the "strength" of the trademark and its ability to invoke an immediate association in the consumer's minds with a plaintiff's goods. *See Hormel,* 73 F.3d at 503. The stronger the mark the broader the protection it is afforded. *Domino's,* 615 F.2d at 259. The strength of the mark "refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979) (citations omitted).

Trademarks fall into three major categories, each accorded a different degree of protection under the law. Least protected are the generic trademarks. A "generic" term is a common descriptive name for a type of product or service, such as "milk" or "cigarettes." *Oleg Cassini, Inc. v. Cassini Tailors, Inc.,* 764 F.Supp. 1104, 1108 (W.D.Tex.1990). Because of its widespread use, the term cannot adequately identify a specific product from a single source, thereby justifying the lack of protection given its user. *Id.* Moderate protection is afforded descriptive or suggestive marks which are marks that either evoke some quality of the product or describe it directly. *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 571 (6th Cir.1987). Fanciful or arbitrary trademarks are awarded the greatest protection. *Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 605 (9th Cir.1987). In this category fall coined marks such as KODAK or XEROX and marks

which use ordinary words in a manner that neither describe nor suggest the product or service to which the mark has been assigned, such as IVORY soap or APPLE computers. *Little Caesar*, 834 F.2d at 571. These marks are considered to be "inherently distinctive" and capable of serving as unique product identifiers, easily distinguishing one merchant's products from those manufactured by others. *Cassini*, 764 F.Supp. at 1108.

■ While names generally fall in the descriptive category, they may be entitled to greater protection "with a showing that through usage the name has acquired distinctiveness ... in the minds of ordinary consumers." *Conan*, 752 F.2d at 155 (citations omitted); *see also Cassini*, 764 F.Supp. at 1109. Defendants concede that the worldwide fame and almost instantaneous recognition that the Elvis or Elvis Presley name has acquired enhance Plaintiff's claim that its trademark is a strong mark. "The more deeply a plaintiff's mark is embedded in the consumer's mind, the more likely it is that the defendant's mark will conjure up the image of the plaintiff's product instead of that of the junior user." *Hormel*, 73 F.3d at 503.

Even though Plaintiff's widely recognized trademarks are deserving of protection, this fact alone does not support a finding of confusion. Confusion is avoided when the defendant uses the plaintiff's mark as a part of a parody, jest, or societal commentary. *Hormel*, 73 F.3d at 503; *Yankee Publishing Inc. v. News America Publishing Inc.*, 809 F.Supp. 267, 273 (S.D.N.Y.1992). Parody has been defined as a subtly humorous, imitative form of criticism, which provides "social benefit by shedding light on an earlier work, and in the process, creating a new one." *Campbell v. Acuff–Rose Music*, 510 U.S. 569, 579, 114 S.Ct. 1164, 1171, 127 L.Ed.2d 500 (1994). By assailing prevalent vices and mores with ridicule, parody has become an especially effective method of exposing the weakness in an idea or value and plays an important role in social commentary. *See L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 28 (1st Cir.1987) *cert. denied* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). Because "the keystone

of parody is imitation," *Nike*, 6 F.3d at 1228, a successful parodist must conjure up enough of the original to "convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original but instead a parody." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 494 (2d Cir.1989). "Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation." *Campbell*, 510 U.S. at 588, 114 S.Ct. at 1176.

Defendants' use of the service mark "The Velvet Elvis" when combined with the bar's gaudy decor form an integral part of Defendants' parody of the faddish, eclectic bars of the sixties. The phrase "velvet Elvis" has a meaning in American pop culture that is greater than the name, image, or likeness of Elvis Presley. The phrase symbolizes tacky, "cheesy," velvet art, including, but not limited to velvet Elvis paintings. Here, the image of Elvis, conjured up by way of velvet paintings, has transcended into an iconoclastic form of art that has a specific meaning in our culture, which surpasses the identity of the man represented in the painting. That image is confirmed upon entering the bar. Plaintiff's own witnesses testified that despite their thoughts about the bar's name, they immediately realized the tacky bar they had just encountered was in no way associated or affiliated with EPE. The humorous jab at the trends of the sixties is almost overpowering and readily apparent with one quick look around a lounge cluttered with tasteless art, long strand beads, and a lighted disco ball conspicuously hung from the ceiling. The customer's recognition and appreciation of Defendants' parody decreases the probability of confusion that would otherwise result from use of a trade name which partially incorporates a relatively strong mark. *See Tetley*, 556 F.Supp. at 794 ("[T]he very heavy handedness of defendant's parody would appear to assure that a clear distinction will be preserved in the consumer's mind between plaintiff's product and [defendant's product]."). Thus, the Court finds that while Plaintiff's mark is entitled to protection, it is doubtful that its inclusion within the name "The Velvet Elvis" will mislead consumers

into believing that the bar is affiliated or somehow associated with EPE. Nor will customers mistake "The Velvet Elvis" for an EPE owned or sponsored business because Elvis related items are used in the bar's decor. This factor therefore weighs against finding a likelihood of confusion exists both with respect to Defendants' use of "The Velvet Elvis" service mark and Elvis memorabilia as bar decor.

## 2. Degree of Similarity Between the Two Marks

The similarity of the disputed marks is determined by comparing their appearance, sound, and meaning. *Jordache*, 828 F.2d at 1484; McCarthy, *supra*, § 23.04. "The proper test is whether the average consumer, upon encountering the allegedly infringing mark in the isolated circumstances of the marketplace and having only a general recollection of the plaintiff's mark, would be likely to confuse or associate the defendant or his services with the plaintiff." *American Automobile Association v. AAA Insurance Agency, Inc.*, 618 F.Supp. 787, 792 (W.D.Tex. 1985). In determining the degree of similarity, the respective marks should be compared as a whole and not by their component parts. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir.1987); *see also* McCarthy, *supra*, § 23.15[1][a]. "The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety." *Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 417, 64 L.Ed. 705 (1920).

As a general rule, "a subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-distinctive matter to it." McCarthy, *supra*, § 23.15[8]. An exception to the general rule is found where the marks in their entireties convey two different meanings. *Long John Distilleries, Ltd. v. Sazerac Co.*, 426 F.2d 1406, 1407, 57 CCPA 1286, (1970) (holding "Long John" and "Friar John" not substantially similar because the marks communicate very different ideas). The Court finds Defendants' service mark

falls within this narrow category of exception because each party's mark creates a very different overall impression. Plaintiff's trademarks obviously refer to the legendary singer, Elvis Presley and products of his image and likeness marketed through EPE and its licensees. The term "The Velvet Elvis," on the other hand, is symbolic of a faddish art style that belongs to the culture that created it. It has no specific connection with the singer other than the coincidence of its use to portray him. Marked dissimilarity in the meaning of two marks can be determinative and weigh against a finding of confusion under this factor. *See Jordache*, 828 F.2d at 1484. "[P]sychological imagery evoked by the respective marks' may overpower the respective similarities or differences in appearance and sound." McCarthy, *supra*, § 23.08[1]; *see also Jordache*, 828 F.2d at 1484. The Court finds any similarity between the marks is outweighed by their strikingly different meanings. Accordingly, the Court finds the lack of similarity between the two marks weighs against a finding of confusion.

## 3. Similarity of Products or Services

"The greater the similarity between products and services, the greater the likelihood of confusion." *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 490 (5th Cir.1992). Direct competition between the parties is not necessary for infringement to occur, *Cassini*, 764 F.Supp. at 1111. Rather, "the gist of the action [for trademark infringement] lies in likelihood of confusion to the public." *Professional Golfers*, 514 F.2d at 669. Confusion may exist "when the sponsor or maker of one business product might naturally be assumed to be the maker. or sponsor of another business or product," although the parties' products or services are non-competitive. *Id.* at 670. In addition, a trademark owner has a definite interest in "preserving avenues of expansion" and is entitled to protection in related fields where the possibility for future growth exists even though he had not entered that particular area at the time the infringement action is brought. *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985).

Thus, protection is extended in cases where it is clear that the plaintiff intends to expand his sales efforts to compete directly with the defendant or it is possible that the public will assume or perceive that an expansion of the plaintiff's operations has in fact occurred although there is no evidence of the plaintiff's expectation to do so. *See Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y.1981).

■ The evidence produced at trial showed that Defendants' bar caters to a young, "hip" crowd, providing patrons with a place to socialize. A customer can go to "The Velvet Elvis" to eat, drink, watch one of many television sets, or smoke a cigar in the bar's smoking room. At the present time, EPE does not provide services comparable to those of "The Velvet Elvis," although it currently operates two family oriented restaurants, one of which serves beer. EPE's operations are based on the sale of Elvis Presley merchandise. Its on-site eateries and ice cream parlors are a byproduct of the commercialization of Graceland rather than a venture into the restaurant business. Plaintiff has, however, indicated its intention to enter Defendants' field and plans to open an "Elvis Presley's" nightclub in Memphis sometime in 1997. Also, Debbie Johnson, General Manager of EPE, testified that an international chain of Elvis Presley restaurant/nightclubs with an Elvis motif is currently under contemplation.

While the Court finds the majority of Plaintiff's revenue is derived from a merchandising market unrelated to the service market Defendants occupy, there is some overlap between the parties' present services. Both parties do in fact operate restaurants, although the businesses are not directly competitive due to the very different clientele and purposes of the respective establishments. As the Plaintiff has presented testimony of its immediate plans to open a Memphis nightclub and future intent to open a chain of similar bars throughout the world, this factor might favor Plaintiff, were it not for the relative clarity of "The Velvet Elvis'" parodic purpose. In *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, the Tenth Circuit, faced with determining a parody's effect on directly competitive products, held against infringement finding that "[t]he benefit to the one making the parody, however, arises from the humorous association, not from public confusion as to the source of the mark." *Jordache*, 828 F.2d at 1486. The Court, in its reasoning, recognized that in order for a parody to convey its message effectively, there must be a clear and obvious difference from the original mark, leaving no room for confusion. To the extent the marks were associated, the Court found that it was for purposes of the parody only. The Court held that because consumers did not associate the two sources of the products, the plaintiff had suffered no actionable injury. *Jordache*, 828 F.2d at 1491. As in *Jordache*, this Court concludes that "The Velvet Elvis" is a successful parody. Defendants' bar is sufficiently dissimilar from any establishment EPE currently operates or has plans to operate in the future to prevent confusion as to the bar's source or origin.

### 4. Identity of Retail Outlets and Purchasers

■ Plaintiff claims that because its operations, specifically, Graceland and EPE-owned restaurants, and "The Velvet Elvis" are open to the general public, this factor should weigh in its favor. The Court nonetheless finds obvious distinctions between the customers of each business. Evidence at trial indicated that the majority of Plaintiff's customers are middle-aged white women while Defendants' customers generally are young professionals, ranging in age from early twenties to late thirties. In this circuit, "[d]issimilarities between ... the predominant consumers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." *Domino's Pizza*, 615 F.2d at 262. In *Domino's Pizza*, the Fifth Circuit found that the striking difference between Domino's Pizza customers, single, young males, and purchasers of Domino sugar products, middle-aged housewives, was not only substantial but significant enough to support an ultimate finding of no confusion. *Id.* With the same type of disparity between customers here, this Court finds a lack of confusion under this factor as well.

## 5. Similarity of Advertising Media

This factor does not weigh in the balance at this time—the parties are not operating in the same geographic market and Plaintiff admits that it rarely advertises because of the widespread and instant recognition of its marks and the Elvis image. Accordingly, this factor is irrelevant.

## 6. Defendants' Intent

A defendant's intent in adopting a particular trademark is critical "since if the mark was adopted with the intent of deriving benefit from the reputation of [the senior user] that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *Domino's Pizza*, 615 F.2d at 263 (quoting RESTATEMENT OF TORTS § 729 cmt. f (1938)). The "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986). Thus, the proper focus "is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir.1984).

 The Court does not find that Defendants had an improper intent when adopting "The Velvet Elvis" as its establishment's name and service mark. Capece testified that the name refers to a particular type of painting and gaudy decor that was characteristic of bars during the sixties. In fact, he claims he was looking at a velvet Elvis painting when he determined that the name would be fitting for the kind of tacky, "cheesy," bar he had envisioned. His intent was to parody a time or concept from the sixties—the Las Vegas lounge scene, the velvet painting craze and perhaps indirectly, the country's fascination with Elvis. By furnishing his bar with tasteless, tacky decor similar to that seen in a typical sixties nightclub, his intent was not only to mock what was once considered the height of sophistication and class but also to provide critical commentary on society as a whole. Reference to Elvis Presley is indirect, yet use of his name is an essential part of the parody because the term, "velvet Elvis," has become a synonym for garish, passe black velvet art. Any association between Elvis and velvet art is attributable to the public's linking Elvis Presley with this particular art form and not to any aspect of Elvis' persona cultivated by Plaintiff for the purpose of achieving national prominence.

Admittedly, a parody derives benefit from the reputation of the trademark holder—it could not be a parody unless it imitated or evoked the original—but parody by its nature depends on a distinguishable difference between the original and the imitation for its success. *See Jordache*, 828 F.2d at 1486. Therefore, because parody relies upon a difference from the original, an intent to parody cannot be equated with an intent to confuse. *See Cardtoons v. Major League Baseball Players Ass'n*, 95 F.3d 959, 967 (10th Cir. 1996) (holding defendant's success depends upon a humorous association of its parody baseball cards with the traditional licensed baseball cards and not on public confusion); *Nike*, 6 F.3d at 1231 ("An intent on the part of the [defendant] to palm off his products as those of another would raise an inference that the customer would likely be confused. An intent to parody raises the opposite inference"). In addressing this very issue, the Second Circuit in *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, considered the lack of subtlety in a parodist's intent as evidence that the defendant did not intend to deceive or mislead customers. *Hormel*, 73 F.3d at 505. The Court noted that a parodist has absolutely nothing to gain from causing confusion among its customers as his parody serves an entirely unique and different function from the original he imitates. *Id.* Likewise, this Court finds that, due to the clarity of Defendants' parody, use of the service mark, "The Velvet Elvis," was not intended to cause confusion among consumers as to the source or sponsorship of Defendants' bar.

## 7. Actual Confusion

Regarding this last factor, the Fifth Circuit stated that "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.

1971); *see also Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975) (holding that very little proof of actual confusion is necessary to sustain a finding of a likelihood of confusion). It is well settled, however, that the plaintiff is not required to prove any instances of actual confusion in order to be entitled to a finding of a likelihood of confusion. *Domino's Pizza,* 615 F.2d at 263; *see also Standard Oil Co. v. Standard Oil Co.,* 56 F.2d 973, 976 (10th Cir.1932) ("One does not have to await the consummation of threatened injury to obtain preventive relief."). However, an absence of actual confusion after a long period of concurrent use of the marks raises a presumption against a likelihood of confusion in the future. *Domino's Pizza,* 615 F.2d at 263; *see Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 173 (5th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) (holding that concurrent use for seventeen months with no actual confusion is "highly significant" in overall assessment when evidence as to other factors is lacking); *Greentree Laboratories, Inc. v. G.G. Bean, Inc.,* 718 F.Supp. 998, 1002 (D.Me.1989) (holding that concurrent use for five years without confusion creates a presumption that confusion is unlikely); *see also* McCarthy, *supra,* § 23.02[3].

In an attempt to prove actual confusion, Plaintiff offered the testimony of four witnesses. Three of the four witnesses were members of the Elvis Presley fan club in Austin, Texas. These fan club members were all women ranging in age from mid-forties to early seventies. They had been shown samples of ads for "The Velvet Elvis" one month before trial and had the opportunity to visit the bar the day before testifying. The first woman, an Elvis fan since age seven and a five time visitor to Graceland, testified that she was offended by the nude paintings of women and the audacity of the bar's owner to hang these paintings in the same room with pictures of Elvis. The second woman, who had an extensive collection of Elvis memorabilia and had been to Graceland twenty-five times, testified that she was also not pleased to see Elvis's memorabilia in a bar, much less a bar that openly displayed portraits of nude women. The third woman, who was the President of the Austin Elvis

Presley Fan Club and claimed to have been to Graceland between forty and fifty times, was likewise offended by the nudity in the decor and was disappointed to have Elvis's name associated with an establishment of this type. The fourth witness was a man who had been to both "The Velvet Elvis" bars. He testified that when first visiting the original "The Velvet Elvis," he initially thought he might be able to buy some Elvis merchandise. He quickly realized, though, upon closer inspection of the bar's decor, that the bar had nothing to do with Elvis Presley. Consistently, each witness acknowledged that once inside "The Velvet Elvis" and given an opportunity to look around, each had no doubt that the bar was not associated or in any way affiliated with EPE.

In addition, Plaintiff was not able to produce evidence of customer complaints or other instances of confusion although "The Velvet Elvis" had been in business at the Richmond Avenue location for more than two years. In fact, Carol Butler, Director of Worldwide Licensing for EPE since July of 1994, testified that she was not aware of any complaints or inquiries from customers, licensees, or employees of EPE regarding the sponsorship of "The Velvet Elvis" or EPE's connection to the Houston establishment. Capece, who oversaw the bar's day to day operations, also testified that he was never contacted or asked whether "The Velvet Elvis" was affiliated, endorsed or licensed by EPE. Based on the evidence presented, the Court concludes that there was an insufficient showing of actual confusion to allow this factor to weigh in Plaintiff's favor. An absence of actual confusion after a period of concurrent use by Plaintiff and Defendants of their respective marks supports the Defendants' position and raises a presumption under *Domino's Pizza* against a likelihood of confusion in the future. *Domino's Pizza,* 615 F.2d at 263.

After reviewing the evidence presented, the Court concludes that Defendants' service mark, "The Velvet Elvis," as currently used, and Defendants' use of Elvis memorabilia as bar decor does not create a likelihood of customer confusion under either the Lanham Act or the common law. Accordingly, the

Court finds this aspect of Plaintiff's infringement claim to be without merit. In light of the Court's disposition of this claim, Defendants' laches, acquiescence, and First Amendment defenses need not be addressed.

## B. The Advertisements

■ The Court reaches a different conclusion with respect to the use of Elvis imagery and indicia of his persona in Defendants' advertisements. The ads clearly lack a recognizable connection with Defendants' parodic purpose. Pictures and images of Elvis Presley would, to the ordinary customer without knowledge of the underlying parody, leave the distinct impression that the bar's purpose was to pay tribute to Elvis Presley or to promote the sale of EPE related products and services. Consequently, use of this type of advertisement can only indicate a marketing scheme based on the tremendous drawing power of the Presley name and its ability to attract consumer interest and attention. Further, without the backdrop of parodic meaning, these ads and their continued circulation will cause confusion, leading customers to wonder if they might find memorabilia of their beloved singer somewhere behind the doors of "The Velvet Elvis." The Court also finds ads which overemphasize the "Elvis" portion of "The Velvet Elvis" service mark to have a comparable effect. The meaning conveyed by the composite mark, "The Velvet Elvis," is lost when the word "Elvis" is overemphasized and dominates a much smaller "Velvet." This transmuted display of Defendants' service mark focuses attention on "Elvis" instead of the meaning of the combined words "The Velvet Elvis" and what they represent together, creating a definite risk that consumers will identify the bar with Presley or EPE.

Plaintiff also presented evidence that this style of advertising did in fact confuse consumers as to the source of the bar's sponsorship. About one month before trial, Plaintiff's counsel showed each witness a sample of Defendants' previous advertisements. They all testified that the ads' use of pictures and images of Elvis led them to believe that "The Velvet Elvis" was connected or otherwise affiliated with Elvis Presley and EPE.

Because "there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion," the Court concludes that Defendants' ads, published between 1992 and 1995, were confusing and misleading. *See World Carpets*, 438 F.2d at 489. Accordingly, the Court finds Defendants' former advertisements which depicted the image and likeness of Elvis, made explicit references to Elvis, or overemphasized the "Elvis" segment of "The Velvet Elvis" service mark to be actionable infringement and conduct amounting to unfair competition, violative of both the common law and Lanham Act.

## III. DILUTION

Plaintiff also requests relief under the Federal Trademark Dilution Act of 1995. 15 U.S.C.A. § 1125(c) (West Supp.1996). Dilution is defined as:

the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127 (West Supp.1996).

■ The dilution theory grants "protection to strong, well-recognized marks even in the absence of a likelihood of confusion" and depends neither upon a showing of a competitive relationship nor a certain degree of correlation or association between the parties goods or services. McCarthy, *supra*, §§ 24.13[1][b], 24.13[1][c]. The goal of dilution theory is to eliminate any "risk of an erosion of the public's identification of [a] very strong mark with the plaintiff alone" and to prevent another user from "diminishing [a mark's] distinctiveness, uniqueness, effectiveness and prestigious connotations." *Tiffany & Co. v. Boston Club, Inc.*, 231 F.Supp. 836, 844 (D.Mass.1964).

To prevail on a claim of dilution, the plaintiff must establish the following two elements: (1) ownership of a distinctive mark, and (2) the likelihood of dilution. *Hormel*, 73 F.3d at 506. Undeniably, Plaintiff owns extremely strong marks. Thus, a finding of dilution in the present case depends on

whether there is the likelihood of dilution. The likelihood of dilution can be shown in two ways—either through blurring or tarnishment. *Id.* Plaintiff claims both blurring and tarnishment have occurred in this case. The Court disagrees.

## A. Blurring

■ Blurring involves "the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon non competing goods." Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 HARV.L.REV. 813, 825 (1927); *see also Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 43 (2d Cir.1994) (" '[B]lurring has typically involved the 'whittling away of any established trademark's selling power through its unauthorized use by others upon dissimilar products.' " (quoting *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989))). Accordingly, dilution is only likely where the junior mark is substantially similar to the senior user's mark. *Mead Data Central*, 875 F.2d at 1028–29; *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1281 (S.D.N.Y.1986). "The paradigmatic dilution case involves the situation where the *same or very similar marks* are being used on vastly different products," thus diminishing the mental association once made between a specific trademark and a certain line of goods. *Jordache Enterprises v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 56 (D.N.M.1985) (emphasis added). In such cases, "the ability of the senior user's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also associates that designation with a new and different source." McCarthy, *supra*, § 24.13[1][b].

■ Under some circumstances, "lack of similarity alone is sufficient to defeat a dilution claim." *Mead Data*, 875 F.2d at 1035–36 (Sweet, J., concurring); *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 120 (2d Cir.1984) (holding names and characters King Kong and Donkey Kong are so vastly different there could be no reasonable question raised as to the validity of plaintiff's blurring claim); *Warner Bros., Inc.*

*v. American Broadcasting Cos.*, 530 F.Supp. 1187, 1198 (S.D.N.Y.1982) (holding plaintiff's Superman character was so different from defendant's The Greatest American Hero that there was no danger of dilution), *aff'd*, 720 F.2d 231 (2d Cir.1983). As previously noted, the Court finds a marked dissimilarity between the parties' marks, particularly with respect to the meaning and the overall impression each mark conveys. The phrase "velvet Elvis" references a particular type of art associated with the sixties era. "Elvis" or "Elvis Presley," on the other hand, suggests only the singer. While the Court finds this distinction to be determinative, the Court also notes that there is very little likelihood that Defendants' parody will weaken the association among the "Elvis" or "Elvis Presley" trademarks and products marketed by EPE.

In a similar case, the Court in *Hormel*, determined whether use of a wild boar muppet named Spa'am as a character in Jim Henson's hit movie *Muppet Treasure Island* blurred the SPAM trademark Hormel had been using for its canned luncheon meat. The Court concluded that Henson's muppet character was created "to poke a little fun at Hormel's famous luncheon meat by associating its processed gelatinous block with a humorously wild boar." *See Hormel*, 73 F.3d at 501. In finding no blurring had occurred, the Court held that parodies did little to diminish the mental connection already formed between a plaintiff's mark and its product. *Id.* at 506. In fact, the Court found their effect was quite the opposite, public identification was increased rather than diluted. *Id.; see also Jordache*, 828 F.2d at 1490.

Again, in *Tetley, Inc. v. Topps Chewing Gum, Inc.*, the Court addressed parody's effect on a mark's capacity as a product identifier. In that case, Tetley, maker of Tetley Tea Bags, sought to enjoin Wacky Packs, a brand of gummed stickers, from distributing a sticker satirically depicting the tea manufacturer's retail packaging entitled "Petley Flea Bags." In rejecting the plaintiff's dilution claim, the Court held that "the broad humor defendant employs serves to prevent the type of blurring which might result from

a more subtle or insidious effort at humor at plaintiff's expense." *Tetley*, 556 F.Supp. at 794. Defendants' overt style of commentary is similar to that employed in *Hormel* and *Tetley* and consequently, this Court finds that Defendants' use of "The Velvet Elvis" as its logo does not blur Plaintiff's marks.

## B. Tarnishment

Tarnishment generally arises when "a plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere*, 41 F.3d at 43 (footnote omitted). The threat of tarnishment occurs when the reputation and goodwill of the plaintiff's trademark is connected with products that "conjure associations that clash with the associations generated by the owner's lawful use of the mark." *L.L. Bean*, 811 F.2d at 31. Generally, tarnishment has been found in cases where a distinctive mark is depicted in a context of sexual activity, obscenity, or illegal activity, *see Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir.1979) (Dallas Cowboy Cheerleader uniforms used in sexually depraved movie); *Coca–Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y.1972) (Coca–Cola logo used in poster stated "Enjoy Cocaine"); *Pillsbury Co. v. Milky Way Productions, Inc.*, 215 U.S.P.Q. 124, 135, 1981 WL 1402 (N.D.Ga.1981) (Pillsbury dough boy depicted engaging in sexual intercourse). Courts have also found tarnishment to occur even though the plaintiff's mark was not portrayed in an unwholesome manner but have done so only in cases involving identical or almost identical trade names, *see Steinway & Sons v. Robert Demars & Friends*, 210 U.S.P.Q. 954, 961, 1981 WL 40530 (C.D.Cal.1981) (Steinway pianos tarnished by Stein–Way clip-on beverage can handles); *Jordache*, 828 F.2d at 1491 (discussing cases where tarnishment was found although there was no unwholesome context and finding that they all involved the use of identical or almost identical trade names on different products), or cases where alterations of a mark are "made by a competitor with both an incentive to diminish the favorable attributes of the mark and ample oppor-

tunity to promote its products in ways that make no significant alteration." *Deere*, 41 F.3d at 45.

This Court has already determined that the marks in dispute are not sufficiently similar to constitute tarnishment on this basis. Further, because the parties are not currently in direct competition nor were they when "The Velvet Elvis" opened, the Court also finds that Defendants' parody does not ridicule Plaintiff's mark for the purpose of promoting its own competitive product. Regardless of the context, however, a finding of dilution by tarnishment must be supported by evidence that the plaintiff's mark will suffer negative associations from the defendant's use. *Hormel*, 73 F.3d at 507. There has been no evidence in this case to indicate that Defendants' service mark has had an actionable impact on the image cultivated by either the "Elvis" or "Elvis Presley" trademarks.

Plaintiff bases its tarnishment claim on the unsupported assumption that Defendants' use of the Elvis name in association with a tacky bar that indiscriminately displays explicit and almost pornographic paintings of nude women has tainted the wholesome image of Elvis and EPE sponsored products and services. The Court finds, however, without any evidence to the contrary, that nude portraits hung in a bar for the purpose of mocking the tasteless decor of the sixties does not inspire negative or unsavory images of Elvis or Elvis related products or services in the minds of EPE customers. *See Tetley*, 556 F.Supp. at 794 (finding plaintiff produced no evidence from either lay consumers or experts to support a claim of tarnishment). Furthermore, the nude pictures and the bar's intentional tackiness are an obvious part of the parody and are associated, to the extent any association is made, for purposes of the parody only, rather than for creating a permanent derogatory connection in the public's mind between the two businesses. *See Jordache*, 828 F.2d at 1491 ("Association of marks for parody purposes without corresponding association of manufacturers does not tarnish or appropriate the good will of the manufacturer of the high quality similar product"). Although "The Velvet Elvis"

might be considered by some customers to be in poor taste, the Court is convinced that it is not likely to prompt an unsavory or unwholesome association in consumers minds with the "Elvis" or "Elvis Presley" trademarks. Absent such a showing, a tarnishment claim cannot be sustained. *See Hormel*, 73 F.3d at 507.

## IV. RIGHT OF PUBLICITY

 Plaintiff claims that Defendants' use of the name, image, likeness, and other indicia of Elvis for the purposes of trade constitutes an appropriation of Elvis Presley's right of publicity. As owner of the exclusive rights in the identity of Elvis, Plaintiff seeks redress for a violation of its common law right as well as its corresponding statutory rights under either Tennessee or Texas law. At the outset, the Court must determine whether to apply Tennessee or Texas law to Plaintiff's claims. Although subject matter jurisdiction in this case is based on an alleged violation of a federal statute, the Lanham Act, Texas choice of law principles will dictate which state's substantive law applies to the pendent state law claims. *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Texas has adopted the "most significant relationship" test, as enunciated in the Restatement (Second) of Conflicts, to resolve all conflict of law cases sounding in tort. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979). The test provides that " 'law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.' " *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir.1990) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984)). The application of the " 'most significant relationship' test does not 'turn on the number of

contacts,' but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6." [2] *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir.1995) (quoting *Gutierrez*, 583 S.W.2d at 318), *cert. denied*, —— U.S. ——, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995). Before this determination is made, the Court must first identify all relevant contacts as a Texas court would. *De Aguilar*, 47 F.3d at 1414. In doing so, the Court is guided by the following factors which are considered when applying the principles of Section 6: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Gutierrez*, 583 S.W.2d at 318–19 (citing RESTATEMENT (SECOND) OF LAWS, § 145 (1971)).

 The Court finds that Plaintiff's right of publicity was violated, if at all, in Texas where aspects of Elvis's persona have been used without consent, *see Baltimore Orioles v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir.1986) (holding players right of publicity might be violated wherever their performances were broadcast without authorization), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987), that the conduct causing the injury occurred in Texas, and that at least one of the parties is domiciled in Texas. Since the "locus of the conduct" is in Texas, the Court believes that Texas has a "greater interest in seeing that its standard of care is applied" because of the affect it will have on the way parties tailor their conduct within the state. *De Aguilar*, 47 F.3d at 1414. "[S]ubject only to rare

---

2. Section six of the Restatement provides:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no directive, the factors relevant to the choice of the applicable rule of law include:
(a) the needs of the interstate and international systems;
(b) the relevant policies of the forum;
(c) the relevant policies of other interested states and the relative interests of those

states in the determination of the particular issue;
(d) the protection of justified expectations;
(e) the basic policies underlying the particular field of law;
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 6 (1971).

exceptions, the local law of the state where the conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, cmt. d, at 417–18. The Court therefore concludes that Texas law will apply to Plaintiff's right of publicity claims.

 The right of publicity has been defined as the "inherent right of every human being to control the commercial use of his or her identity" and prevent the exploitation of any aspect of their persona without permission. McCarthy, *supra*, § 28.01[2][a]; *see also* J. McCarthy, *Melville B. Nimmer and the Right of Publicity: A Tribute*, 34 UCLA L.REV. 1703, 1704 (1987). It is considered a property right and is descendible as an asset of the estate upon an individual's death. *See* TEX.PROP.CODE.ANN. § 26.002 (Vernon 1984 & Supp.1996). Publicity rights do not have a "likelihood of confusion" requirement and are more expansive than any statutory or common law right to protection against trademark infringement. *Rogers v. Grimaldi*, 875 F.2d 994, 1003 (2d Cir.1989). To violate a plaintiff's right of publicity, however, the defendant must employ an aspect of persona in a manner that symbolizes or identifies the plaintiff, such as the use of a name, nickname, voice, picture, achievements, performing style, distinctive characteristics or other indicia closely associated with a person. McCarthy, *supra*, § 28.01[4]. Appropriation becomes actionable when "it is used to advertise the defendant's business or product, or for some similar commercial purpose." RESTATEMENT (SECOND) OF TORTS § 652C, cmt. b; *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir.1994).

Under Texas law a person is specifically prohibited from using:

> without the written consent of a person who may exercise the property right, a deceased individual's name, voice, signature, photograph, or likeness in any manner, including: (1) in connection with products, merchandise or goods; or (2) for purpose of advertising, selling, or soliciting the purchase of products, merchandise, goods or services.

TEX.PROP.CODE § 26.011 (Vernon 1984 & Supp.1996). A *prima facie* case requires proof that (1) the defendant has appropriated another's identity and (2) is using it for trade or commercial benefit. *Matthews*, 15 F.3d at 437.

Plaintiff claims that Defendants have violated its publicity rights by using the Elvis name as part of its service mark, by promoting its bar services through ads containing pictures or using the image or likeness of Elvis, by making reference to Elvis on its dinner menu, and by using Elvis memorabilia as bar decor. In essence, the Plaintiff's complaint is that "The Velvet Elvis" is simply a disguised attempt at capitalizing on the identity of Elvis Presley.

 Unquestionably, use of pictures or images of Elvis in "The Velvet Elvis" advertisements is an unlawful appropriation of the identity of Elvis Presley. Elvis is clearly identifiable and the only distinguishable purpose of the ads is to exploit the persona of Elvis for commercial advantage. Defendants admitted as much when they expressed a willingness at trial to be permanently enjoined from using similar advertisements in the future. The mention of Graceland or use of phrases in ads that are linked inextricably to the identity of Elvis as a celebrity, such as "Elvis has left the building" is also violative of Plaintiff's publicity rights. A celebrity's identity can be appropriated unlawfully even without use of his name or likeness. *See Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 835 (6th Cir.1983) (holding Defendant "Here's Johnny Portable Toilets, The World's Foremost Commodian" appropriated the identity of Johnny Carson by using the phrase "Here's Johnny" as a trade name); *Ali v. Playgirl, Inc.*, 447 F.Supp. 723, 729 (S.D.N.Y.1978) (holding picture published in defendant's magazine of a nude man closely resembling Muhammad Ali accompanied by verse "The Greatest" violated Ali's right of publicity). A violation can occur simply in the use of a phrase that clearly identifies the celebrity such as "Here's Johnny." *Carson*, 698 F.2d at 836.

■ Use of Elvis memorabilia as decor, on the other hand, does not amount to any violation as it is not intended for the purpose of advertising, selling, or soliciting the purchase of products, merchandise, goods or services. In other words, the function of the memorabilia is not to promote a product or capitalize on the personality of Elvis himself but rather to recreate an era of which Elvis was a public part. In fact, with the exception of the now infamous velvet Elvis portrait, Defendants have removed most of the Elvis related objects with no apparent effect on the bar's message or success. Likewise, the Court finds the menu's use of the expression "King of Dive Bars" and its incorporation of peanut butter and banana sandwiches as a menu item are not actionable. While it may be true that Elvis enjoyed peanut butter and banana sandwiches, this fact alone will not support a claim for violation of the Plaintiff's right of publicity. To trigger infringement the plaintiff must be clearly identifiable from use of the item or phrase in question. *McFarland v. Miller,* 14 F.3d 912, 920 (3d Cir.1994) (recognizing that without identification, the right of publicity is worthless); *see also* McCarthy, *supra,* § 28.01[4]. Such is not the case here.

■ Additionally, the Court finds Defendants' use of the service mark, "The Velvet Elvis," does not amount to an unauthorized commercial exploitation of the identity of Elvis Presley. The service mark represents an art form reflective of an era that Elvis helped to shape. "The velvet Elvis" became a coined phrase for the art of velvet paintings and was adopted by Defendants for this reason—not because of its identification with Elvis Presley. Elvis's association with velvet paintings was not a product of his own doing nor can it be considered a part the character or personality of Elvis that Plaintiff has the right to control. Unlike "Here's Johnny," this phrase is not the thumbprint, work product, or tangible expression of Elvis Presley's celebrity identity. The mere association of a phrase or expression with a celebrity without the intent or effect of exploiting his identity or persona is insufficient cause for a violation of publicity rights.

■ Even assuming a violation of Plaintiff's right of publicity, Defendants' use of "The Velvet Elvis" as its service mark should be protected expression under the First Amendment. Consistently, courts have held that book, movie, or song titles using celebrities names are not violative of publicity rights and are protected speech under the First Amendment where the use of the celebrity's name "is clearly related to the content of the [underlying commodity] and is not a disguised advertisement for the sale of goods or services or a collateral commercial product." *Rogers,* 875 F.2d at 1004; *Hicks v. Casablanca Records,* 464 F.Supp. 426, 433 (S.D.N.Y.1978); *Guglielmi v. Spelling–Goldberg Productions,* 25 Cal.3d 860, 160 Cal.Rptr. 352, 353, 603 P.2d 454, 455 (1979). The Second Circuit in *Rogers v. Grimaldi,* despite acknowledging a title's commercial component, nonetheless held the expressive element of titles "requires more protection than the labeling of ordinary commercial products." *Rogers,* 875 F.2d at 998 (footnote omitted). With concern for the preservation of free expression and the special protection this category of speech should be given, the Court concluded that publicity rights should not be permitted to serve as a categorical bar to the use of celebrities' names in titles. *Rogers,* 875 F.2d at 1004. This Court believes the reasoning of *Rogers* to be applicable in this case.

■ Finally, Plaintiff also accuses Defendants of violating its right of publicity by selling a frozen drink called "Love Me Blenders" and a food item named "Your Football Hound Dog." The Court finds that the connection with Elvis's hit songs "Love Me Tender" and "Hound Dog" is an obvious attempt at humor and plays a supporting part in the overall parody. Its use, therefore, is not actionable. Deference under the First Amendment has been afforded to the commercial use of celebrity identities when included as a part of a parody. In *Cardtoons v. Major League Baseball Players Ass'n,* the Tenth Circuit rejected a claim brought by professional baseball players that their publicity rights were violated by the sale of parody trading cards featuring their caricatures and humorous commentary about their careers. 95 F.3d 959, 973 (10th Cir.1996).

The Court viewed parody as a "valuable communicative resource" and "a vital commodity in the marketplace of ideas" through which "a parodist can, with deft and wit, readily expose the foolish and absurd in society." *Cardtoons*, 95 F.3d at 972. After carefully balancing the possible speech restriction against the government's interest in protecting an individual's right of publicity, the Court found that a celebrity's interest in preserving his property rights must yield to society's more compelling interest in free expression, ultimately holding that a restriction on the use of celebrity identities in parodies was an unconstitutional restraint on the communication of ideas. *Cardtoons*, 95 F.3d at 972. Although the baseball players in *Cardtoons* were the direct focus of the parody, this Court nonetheless finds that the balancing test employed by the *Cardtoons* court would also apply and weigh in favor of expression in cases such as the instant case where the name, image, or identity of the celebrity is an indirect, yet vital part of the overall success of the parody. For the foregoing reasons, the Court therefore determines that Plaintiff's claims under TEX.PROP. CODE § 26.011 must fail.

## V. REMEDIES

The Court has found Defendants liable for the following with respect to Defendants' mode of advertisement: trademark infringement and unfair competition under the Lanham Act and the common law and a violation of Plaintiff's publicity rights under TEX.PROP. CODE § 26.011. The Court will now address the appropriate remedy. Plaintiff seeks injunctive relief, an accounting of profits, and attorney's fees and costs.

■■■ Under both the Lanham Act and common law, the Court has the discretion to issue an injunction to prevent the continuation of trademark infringement or acts of unfair competition. 15 U.S.C. § 1116; *see also* McCarthy, *supra*, § 30.01. While the Court is not sure if Elvis has left the building, it is clear that Elvis left Defendants' ads sometime in 1995. Ordinarily, since Defendants have discontinued their use of this type of advertisement and Capece renounced any intent to resume similar advertising in the

future, injunctive relief might not be available as a remedy. However, the Court still believes there is a definite possibility that ads including the image or likeness of Elvis Presley, references to Elvis, or his name disproportionately displayed may be used in connection with "The Velvet Elvis" again. Capece acknowledged that employees of "The Velvet Elvis" published ads, without his approval or awareness, containing pictures and direct references to Elvis Presley even after he specifically requested they stop. The Court thereby finds that with a management style that leaves day to day operations in the hands of its employees, injunctive relief is the proper remedy and necessary to prevent the continuation of advertisements which improperly display the image of Elvis, which make direct references to his identity as a celebrity or which emphasize the word "Elvis" in the mark "The Velvet Elvis."

■■■ The Court declines to order an accounting of profits or an award of attorney fees. Plaintiff's request for an accounting of profits is denied based on the complete absence of evidence showing lost or diverted sales. *See Pebble Beach Company v. Tour 18 I, Ltd.*, 942 F.Supp. 1513 (S.D.Tex.1996). The Court also denies Plaintiff's request for attorney fees because the evidence does not support a finding that the violative acts in this case were malicious, fraudulent, deliberate or willful as necessary for an award of attorney fees under the Lanham Act. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir.1996).

Therefore, the Court **ORDERS** that Plaintiff is entitled to permanent injunctive relief as follows: Defendants and all persons in active concert or participation with Defendants are permanently enjoined from using in connection with the promotion or advertising of "The Velvet Elvis" the image and likeness of Elvis Presley, phrases that are inextricably linked to the identity of Elvis, or from displaying the "Elvis" portion of their service mark in print larger than that used for its counterpart "Velvet." The Defendants shall comply with this injunction immediately upon entry of final judgment. All additional relief requested by Plaintiff not specifically granted is herein denied.

This Order is a **FINAL JUDGMENT.**

The Clerk shall enter this Order and mail a copy to all parties. If said parties can no longer be reached at their disclosed addresses, the Court further **ORDERS** all correspondence be "Returned to Sender."

Thank you. Thank you very much.