REVISED, May 27, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-20096

_____


ELVIS PRESLEY ENTERPRISES, INCORPORATED,

                              Plaintiff-Appellant,

v.

BARRY CAPECE, A United States Citizen; VELVET
LIMITED, A Texas Limited Partnership; AUDLEY
INCORPORATED, A Texas Corporation,

                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

May 7, 1998

Before REYNALDO G. GARZA, KING, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

     Plaintiff-appellant Elvis Presley Enterprises, Inc. appeals
the district court's judgment that defendants-appellees' service
mark, "The Velvet Elvis," does not infringe or dilute its federal
and common-law trademarks and does not violate its right of
publicity in Elvis Presley's name.  See Elvis Presley Enters. v.
Capece, 950 F. Supp. 783 (S.D. Tex. 1996).  Because the district
court failed to consider the impact of defendants-appellees'
advertising practices on their use of the service mark and
misapplied the doctrine of parody in its determination that "The
Velvet Elvis" mark did not infringe Elvis Presley Enterprises,

Inc.'s marks, we reverse the district court's judgment on the trademark infringement claims and remand the case for entry of an injunction enjoining the use of the infringing mark.

## I. BACKGROUND

Plaintiff-appellant Elvis Presley Enterprises, Inc. (EPE) is the assignee and registrant of all trademarks, copyrights, and publicity rights belonging to the Elvis Presley estate. EPE has at least seventeen federal trademark registrations, as well as common-law trademarks, for "Elvis Presley" or "Elvis" and other registrations for his likeness. However, none of these marks is registered for use in the restaurant and tavern business. Prior to trial, EPE announced plans to open a Memphis nightclub as part of a possible worldwide chain. The Memphis nightclub opened subsequent to trial. EPE licenses a wide variety of products and operates Graceland, Elvis's home, as a tourist attraction with adjacent retail stores and restaurants. Over 700,000 visitors per year come from all fifty states and from around the world to visit Graceland. Merchandise sales have brought in over $20 million in revenue over a five-year period and account for the largest portion of EPE's revenue.

In April 1991, defendant-appellee Barry Capece, operating through the limited partnership Beers 'R' Us, opened a nightclub on Kipling Street in Houston, Texas called "The Velvet Elvis." On August 28, 1991, Capece filed a federal service mark application for "The Velvet Elvis" for restaurant and tavern services with the United States Patent and Trademark Office

2

(PTO). In December 1992, the service mark was published in the Official Gazette of the United States Patent and Trademark Office as required by 15 U.S.C. § 1062(a). EPE was aware of this publication, but did not file an opposition to the mark's registration within thirty days under 15 U.S.C. § 1063. Accordingly, the PTO issued a service mark registration to Capece for use of "The Velvet Elvis" mark on March 9, 1993. The Kipling Street nightclub closed in July 1993 for business reasons.

After the Kipling Street location's closing, Capece began soliciting investors to reopen the nightclub at a new location. The new nightclub, to be located on Richmond Avenue, would have the same name, "The Velvet Elvis," but it would be run by a new limited partnership, Velvet, Ltd. Audley, Inc. is the general partner of Velvet, Ltd., and Capece is the sole shareholder of Audley, Inc.[1] Capece began renovating the new location in January 1994. In July 1994, EPE contacted Capece by letter, threatening him with legal action if the bar opened with "Elvis" in its name. The Richmond Avenue location opened in August 1994 under the name "The Velvet Elvis."

The Defendants' bar serves a wide variety of food and liquor, including premium scotches and bourbons. The menu items range from appetizers to full entrees. Live music is regularly featured at the bar, and the bar claims to be the first cigar bar in Houston. Its decor includes velvet paintings of celebrities

---

[1] Hereinafter, we will refer to Barry Capece; Velvet, Ltd.; and Audley, Inc. collectively as the Defendants.

and female nudes, including ones of Elvis and a bare-chested Mona Lisa.  Other "eclectic" decorations include lava lamps, cheap ceramic sculptures, beaded curtains, and vinyl furniture. Playboy centerfolds cover the men's room walls.

In addition to the velvet painting of Elvis, the bar's menu and decor include other Elvis references.  The menu includes "Love Me Blenders," a type of frozen drink; peanut butter and banana sandwiches, a favorite of Elvis's; and "Your Football Hound Dog," a hotdog.  The menu bears the caption "The King of Dive Bars," and one menu publicized "Oscar at The Elvis," an Academy Awards charity benefit to be held at the bar.  Numerous magazine photographs of Elvis, a statuette of Elvis playing the guitar, and a bust of Elvis were also among the decorations.  By the time of trial, many of these decorations had been removed from the Defendants' bar and replaced with non-Elvis items.

Pictures and references to Elvis Presley appeared in advertising both for the Kipling Street location and for the Richmond Avenue location from the date it opened through early 1995, and some ads emphasized the "Elvis" portion of the name by "boldly display[ing] the 'Elvis' portion of 'The Velvet Elvis' insignia with an almost unnoticeable 'Velvet' appearing alongside in smaller script."  Elvis Presley Enters. v. Capece, 950 F. Supp. 783, 789 (S.D. Tex. 1996).  The Defendants made direct references to Elvis and Graceland in advertisements with phrases such as "The King Lives," "Viva la Elvis," "Hunka-Hunka Happy Hour," and "Elvis has not left the building."  Advertisements

4

also included a crown logo above the "V" in "The Velvet Elvis" mark. Advertised promotional events at the Defendants' bar have included parties commemorating Elvis's birth and death and appearances by Elvis impersonators and Elvis Presley's drummer. Some advertisements publicizing the opening of the Richmond Avenue location included direct references to Elvis and used the tag-line "the legend continues" without using "The Velvet Elvis" mark.

In April 1995, EPE filed suit against the Defendants, alleging claims for federal and common-law unfair competition and trademark infringement, federal trademark dilution, and violation of its state-law rights of publicity in Elvis Presley's name and likeness. EPE sought injunctive relief, costs, attorneys' fees, and an order to the Commissioner of Patents and Trademarks to cancel Capece's registration for "The Velvet Elvis." The case was tried to the district court, which ruled in favor of EPE on its claims of trademark infringement and unfair competition relating to the Defendants' advertising practices, but not those claims relating to their use of "The Velvet Elvis" service mark. Id. at 796-97. In addition, the court ruled in favor of EPE on its right of publicity claim in relation to the use of Elvis's name and likeness, but again not in relation to the use of "The Velvet Elvis" service mark. Id. at 801-02. As to the claims upon which EPE succeeded, the district court granted injunctive relief barring the use, in connection with the promotion or advertising of the bar, of "the image or likeness of Elvis

5

Presley, phrases that are inextricably linked to the identity of Elvis, or from displaying the 'Elvis' portion of their service mark in print larger than that used for its counterpart 'Velvet.'"  Id. at 803.  Upon all other claims, the district court ruled in favor of the Defendants and denied all other relief.  Id.  EPE now appeals.

## II.  DISCUSSION

EPE has appealed that portion of the district court's judgment denying relief on its trademark infringement claims, its federal dilution claim, and its right of publicity claim based only upon the Defendants' use of "The Velvet Elvis" mark and the district court's denial of an accounting of profits and attorneys' fees.  Because it ruled in favor of the Defendants, the district court did not reach their defenses of laches or acquiescence.  The Defendants reassert these defenses on appeal as alternative bases for affirming the district court's judgment.[2]  We consider each issue in turn.

## A.    **Trademark Infringement**

The district court clearly stated EPE's claim:

> [EPE] claims the inclusion of its "Elvis" trademark in
> the service mark "The Velvet Elvis" coupled with
> Defendants' use of the image and likeness of Elvis

---

[2]  The Defendants asserted a First Amendment defense to trademark infringement below, but they do not reassert it on appeal, thus abandoning the defense.  See Brinkman v. Dallas County Deputy Sheriff Abner, 813 F.2d 744, 748 (5th Cir. 1987) ("We will not raise or discuss legal issues that [appellant] has failed to assert."); Fehlhaber v. Fehlhaber, 681 F.2d 1015, 1029 (5th Cir. Unit B 1982) (noting that a failure to brief and argue a constitutional defense is grounds for finding that the defense has been abandoned).

> Presley in advertising, promoting, and rendering bar services creates confusion as to whether EPE licensed, approved, sponsored, endorsed or is otherwise affiliated with "The Velvet Elvis," constituting unfair competition and trademark infringement under the common law and Lanham Act.

Id. at 789. The district court also correctly stated the generally applicable law in this circuit to a trademark infringement claim. Id. at 789-91. First, we will summarize this applicable law and then examine the district court's decision.

### 1. Applicable law

For EPE to prevail on its trademark infringement claim, it must show that the Defendants' use of "The Velvet Elvis" mark and image, likeness, and other referents to Elvis Presley creates a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship of the Defendants' bar. See Society of Fin. Exam'rs v. National Ass'n of Certified Fraud Exam'rs, Inc., 41 F.3d 223, 227 (5th Cir.), cert. denied, 515 U.S. 1103 (1995); Oreck Corp. v. U.S. Floor Sys., Inc., 803 F.2d 166, 170 (5th Cir. 1986); see also 15 U.S.C. §§ 1114(1), 1125(a)(1)(A). Liability for trademark infringement hinges upon whether a likelihood of confusion exists between the marks at issue. See Society of Fin. Exam'rs, 41 F.3d at 227. Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion. See Blue Bell Bio-Med. v. Cin-Bad, Inc., 864 F.2d 1253, 1260 (5th Cir. 1989); see also 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:3 (4th ed. 1997). A determination of a likelihood of

7

confusion under federal law is the same as the determination of a likelihood of confusion under Texas law for a trademark infringement claim. See Zapata Corp. v. Zapata Trading Int'l, Inc., 841 S.W.2d 45, 47 (Tex. App.--Houston [14th Dist.] 1992, no writ) (applying Texas law to a trademark infringement claim); see also Blue Bell Bio-Med., 864 F.2d at 1261 (citing Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 706 (5th Cir. Unit A Oct. 1981) (applying Texas law to an unfair trade practices claim)).[3]

In determining whether a likelihood of confusion exists, this court considers the following nonexhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. See Conan Properties, Inc. v. Conans Pizza, Inc., 752 F.2d 145, 149 (5th Cir. 1985). No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive

---

[3] The district court found that Texas law applied in its discussion of EPE's statutory right of publicity. Elvis Presley Enters., 950 F. Supp. at 800-01. No explicit choice-of-law determination was made in relation to the state trademark or unfair competition claims. For the same reasons that the district court stated in its opinion in relation to the right of publicity, id., it would have determined that Texas law applied to the trademark infringement claims. Because EPE does not dispute this determination by the district court, we will follow the district court and apply the laws of Texas to all the state law claims. See Snydergeneral Corp. v. Continental Ins. Co., 133 F.3d 373, 375 (5th Cir. 1998).

8

finding on a majority of these "digits of confusion."  Id. at 150; see also Society of Fin. Exam'rs, 41 F.3d at 228 & n.15.  In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists.  See Armco, Inc. v. Armco Burglar Alarm Co., 693 F.2d 1155, 1160-61 (5th Cir. 1982).  Parody is one such other relevant factor that a court may consider in a likelihood-of-confusion analysis.  See Dr. Seuss Enters. v. Penguin Books USA, Inc., 109 F.3d 1394, 1405 (9th Cir.), cert. dismissed, 118 S. Ct. 27 (1997); Nike, Inc. v. "Just Did It" Enters., 6 F.3d 1225, 1231 (7th Cir. 1993) (holding that parody is not an affirmative defense to trademark infringement but that it can be an additional factor in a likelihood-of-confusion analysis); Jordache Enters. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir. 1987) (considering parody as a factor in determining whether a likelihood of confusion exists).

Neither the trademark and service mark registrations of EPE or the service mark registration of Capece disposes of EPE's trademark infringement claim.  Proof of registration of a service mark or trademark is only prima facie evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration.  15 U.S.C. § 1115(a).  However, such proof does "not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered."  Id.  A registration only becomes conclusive evidence of a

9

registrant's exclusive right to use a mark after five consecutive years of continuous use in commerce, subject to a few enumerated defenses.  Id. §§ 1065, 1115(b).  "The Velvet Elvis" mark has not become incontestable, but Capece's registration of the mark constitutes prima facie evidence of the mark's validity and that there is no likelihood of confusion with previously registered marks.  See id. § 1115(a).  EPE's registration of the Elvis and Elvis Presley marks establishes that it is entitled to protection from infringement by junior users, thereby meeting the threshold requirement that the plaintiff must possess a protectible mark, which must be satisfied before infringement can be actionable.  Id. §§ 1052(d), 1057, 1115(a); see also Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir. 1980).

## 2.    The decision below

After correctly summarizing the applicable law, the district court then proceeded to consider EPE's trademark infringement and unfair competition claims.  In doing so, the court explicitly isolated its consideration of "The Velvet Elvis" mark and the bar's decor from any consideration of the Defendants' advertising and promotional practices.  Elvis Presley Enters., 950 F. Supp. at 791, 797.

### a.    Service mark and the bar's decor

Beginning with the bar's decor and "The Velvet Elvis" mark, the district court considered each of the digits of confusion in turn.  First, on the type of mark, the district court found that EPE has strong marks, but that the "Defendants' use of the

10

service mark 'The Velvet Elvis' when combined with the bar's gaudy decor form[s] an integral part of Defendants' parody of the faddish, eclectic bars of the sixties." Id. at 792. The district court found that the mark "symbolizes tacky, 'cheesy,' velvet art, including, but not limited to velvet Elvis paintings" and that "the image of Elvis, conjured up by way of velvet paintings, has transcended into an iconoclastic form of art that has a specific meaning in our culture, which surpasses the identity of the man represented in the painting." Id. Despite EPE's strong marks which would normally be accorded broad protection, the bar's parody of "faddish, eclectic bars of the sixties" led the district court to find that the name and decor of the bar would not mislead consumers and that this digit weighed against a likelihood of confusion. Id. at 793.

Second, on the similarity of the marks, the district court found that "The Velvet Elvis" has a meaning independent from Elvis Presley. Specifically, the district court concluded that "The Velvet Elvis" "is symbolic of a faddish art style" that "has no specific connection with the singer other than the coincidence of its use to portray him." Id. The district court noted that "'[t]he proper test is whether the average consumer, upon encountering the allegedly infringing mark in the isolated circumstances of the marketplace . . . would be likely to confuse or associate the defendant or his services with the plaintiff.'" Id. (quoting American Auto. Ass'n v. AAA Ins. Agency, 618 F. Supp. 787, 792 (W.D. Tex. 1985)). Because of the dissimilarity

11

in the meanings of the Defendants' and EPE's marks, the district court found that this digit of confusion weighed against a likelihood of confusion. Id.

Third, on the similarity of the products and services, the district court noted that, at the time of trial, there was some overlap between the parties' services, but that the services were not directly competitive because they served different clienteles and had different purposes. Id. at 794. While noting that EPE's plan to open a chain of Elvis Presley nightclubs might weigh in favor of a likelihood of confusion, the district court found that "the relative clarity of 'The Velvet Elvis'' parodic purpose" made it dissimilar from any business that EPE currently operates or has plans to operate. The district court thus concluded that this digit weighed against a likelihood of confusion. Id.

Fourth, on the identity of the retail outlets and purchasers, the district court found that the majority of EPE's customers are "middle-aged white women" and that the Defendants' customers are generally "young professionals, ranging in age from early twenties to late thirties." Id. at 794. In the district court's analysis, this disparity between the customers weighed against a likelihood of confusion. Id. (relying upon Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 262 (5th Cir. 1980)).

Fifth, on the identity of the advertising media, the district court found that this digit of confusion was irrelevant

12

to the determination of a likelihood of confusion because the parties operate in different geographic markets and because EPE admits that it rarely advertises because of the strength of its marks and Elvis's image.  Id. at 795.

Sixth, on the Defendants' intent, the district court found that the Defendants intended to parody "a time or concept from the sixties--the Las Vegas lounge scene, the velvet painting craze and perhaps indirectly, the country's fascination with Elvis."  Id.  The district court noted that the references to Elvis are indirect, but that the "use of his name is an essential part of the parody because the term, 'velvet Elvis,' has become a synonym for garish, passe black velvet art."  Id.  The district court found that the Defendants' intent weighed against a likelihood of confusion because the "clarity" of the Defendants' parody showed that they did not intend to confuse the public.

Seventh, on actual confusion, the district court found that EPE failed to show any actual confusion because "each witness acknowledged that once inside 'The Velvet Elvis' and given an opportunity to look around, each had no doubt that the bar was not associated or in any way affiliated with EPE."  Id. at 796. Additionally, the district court considered the fact that the Defendants' bar had been in operation at the Richmond Avenue location without any complaints or inquiries about the affiliation of the bar with EPE.  Id.  Relying upon this evidence, the district found that this digit of confusion weighed against a likelihood of confusion.

Having found none of the digits of confusion weighing in favor of a likelihood of confusion, the district court found no likelihood of confusion in relation to the bar's decor or "The Velvet Elvis" mark, and therefore found that the use of the Defendants' mark caused no infringement.

### b. The Defendants' advertising practices

The district court next turned to the Defendants' advertising practices and found that their advertising scheme would leave the ordinary customer with

> the distinct impression that the bar's purpose was to pay tribute to Elvis Presley or to promote the sale of EPE related products and services. Consequently, use of this [advertising scheme] can only indicate a marketing scheme based on the tremendous drawing power of the Presley name and its ability to attract consumer interest and attention.

Id. at 797. Further, the district court noted that the advertising, without the backdrop of the parody, "will cause confusion, leading customers to wonder if they might find [Elvis] memorabilia" in the bar and that the Defendants' emphasis of the "Elvis" portion of the mark over the "Velvet" portion focusses attention on Elvis and "creat[es] a definite risk that consumers will identify the bar with Presley or EPE." Id. Additionally, the district court found that the Defendants' advertising caused actual confusion. Based upon the above findings the district court found that the Defendants' advertising practices, including the actual configuration of the mark emphasizing "Elvis," constituted trademark infringement and unfair competition. Id.

14

Despite the facts that the Defendants had discontinued the activity that the district court found to be infringing and that Capece stated that they would not resume the activity, the district court believed that "there [was] a definite possibility that ads including the image or likeness of Elvis Presley, references to Elvis, or his name disproportionately displayed may be used in connection with 'The Velvet Elvis' again." Id. at 803. Even after acknowledging that the cessation of activity might make an injunction unavailable, the court issued an injunction barring the use in the Defendants' advertising of "the image and likeness of Elvis Presley, phrases that are inextricably linked to the identity of Elvis, or from displaying the 'Elvis' portion of their service mark in print larger than that used for its counterpart 'Velvet.'" Id.

### 3. Standard of review

We review questions of law de novo and questions of fact for clear error. Joslyn Mfg. Co. v. Koppers Co., 40 F.3d 750, 753 (5th Cir. 1994). Likelihood of confusion is a question of fact reviewed for clear error. Society of Fin. Exam'rs, 41 F.3d at 225; Blue Bell Bio-Med., 864 F.2d at 1260. However, "the 'clearly erroneous' standard of review does not insulate factual findings premised upon an erroneous view of controlling legal principles." Johnson v. Hospital Corp. of Am., 95 F.3d 383, 395 (5th Cir. 1996) (citing Johnson v. Uncle Ben's, Inc., 628 F.2d 419, 422 (5th Cir. 1980), vacated on other grounds, 451 U.S. 902 (1981)); see also In re Auclair, 961 F.2d 65, 69 n.7 (5th Cir.

15

1992) ("Factual findings made under an erroneous view of the law are not binding on the appellate court." (citing 1 STEVEN ALAN CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 2.16, at 2-116 (2d ed. 1992))).  When a likelihood-of-confusion factual finding is "inextricably bound up" in, or infected by, a district court's erroneous view of the law, we may conduct a de novo review of the fully-developed record before us.  See Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 773 (8th Cir. 1994) (applying de novo review where the district court misapplied the First Amendment in relation to parody in its likelihood-of-confusion determination); see also Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 46-47 (5th Cir. 1975) (reviewing the district court's fact-finding on a likelihood of confusion de novo where it applied the incorrect legal standard).

EPE argues that the district court erroneously applied parody to its likelihood-of-confusion analysis and that this error permeated its entire analysis, infecting nearly all of its findings of fact.  Within EPE's discussion of the digits of confusion, it also argues that the district court erred in isolating its consideration of the Defendants' advertising from its consideration of whether "The Velvet Elvis" mark infringes EPE's marks.  If the district court erred as EPE argues, then we would review the likelihood-of-confusion finding de novo, rather than for clear error.  We will consider the district court's isolation of the advertising evidence from its analysis first.

### a. Isolated consideration of advertising

The use of a mark in advertising is highly probative of whether the mark creates a likelihood of confusion in relation to another mark. "Evidence of the context in which a mark is used on labels, packages, or in advertising material directed to the goods is probative of the reaction of prospective purchasers to the mark." In re Abcor Dev. Corp., 588 F.2d 811, 814 (C.C.P.A. 1978). Courts consider marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements. See The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 962 (2d Cir. 1996) (considering the appearance of the mark in advertising in determining similarity of marks); Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94-95 (2d Cir. 1993) (same); Oreck Corp., 803 F.2d at 171 (considering the presentation of the marks in advertising in determining the similarity of the marks and the defendant's intent); Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311, 318 (5th Cir. 1981) (considering the presentation of the marks in advertising in determining the similarity of the marks); National Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co., 362 F.2d 374, 378 (5th Cir. 1966) (comparing marks as used in advertising in newspapers and on television where the black and white format did not allow for color distinctions); see also Sun-Maid Raisin Growers v. Sunaid Food Prods., Inc., 356 F.2d 467, 469 (5th Cir. 1966) ("[I]t is the labels that the prospective purchaser sees. The trademarks cannot be isolated from the labels on which they appear.").

In the case of a service mark, advertising is of even greater relevance because the mark cannot be actually affixed to the service, as a trademark is to the goods. Many prospective purchasers first encounter the mark in advertising, rather than on the product; therefore, the service mark cannot be isolated from the advertising in which it appears. See RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21(a)(i) (1995) (stating that "the overall impression created by the [marks] as they are used in marketing the respective goods and services" is relevant to how similar two marks are (emphasis added)). The Lanham Act itself makes advertising relevant to a service mark infringement claim. In order to infringe another's mark, the infringing mark must be used in commerce. 15 U.S.C. § 1114. By definition, a service mark is used in commerce "when it is used or displayed in the sale or advertising of services." Id. § 1127 (emphasis added). In summary, advertisements used by the alleged infringer, which incorporate the allegedly infringing mark, are relevant in determining whether a mark has been infringed. Advertisements are therefore relevant to the likelihood-of-confusion analysis.

In addition, the context of the presentation of a mark, including advertising, is relevant to the meaning that the mark conveys. McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1133 (2d Cir. 1979) ("'[T]he setting in which a designation is used affects its appearance and colors the impression conveyed by it.'" (brackets in original) (quoting RESTATEMENT OF TORTS § 729 cmt. b, at 593 (1938))). The Supreme Court has said that "[t]he

18

protection of trade-marks is the law's recognition of the psychological function of symbols." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205 (1942). To understand a symbol's psychological function, one must consider it in the context in which it is used and not in a vacuum. See American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 11 & n.7 (5th Cir. 1974) ("[W]ords are chameleons, which reflect the color of their environment."); 2 JEROME GILSON, TRADEMARK PROTECTION AND PRACTICE § 5.09[1], at 5-137 n.1 (Jeffrey M. Samuels ed., 1997) (noting that advertising is used by the holders of marks to "establish[] a sufficient aura of desirability to induce the public to purchase" their products and services). Courts have recognized this fact in determining whether a mark has developed a secondary meaning as an indicator of source independent from its everyday meaning, entitling the mark to protection under the Lanham Act. See, e.g., G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 994-95 (7th Cir. 1989); American Heritage Life Ins. Co, 494 F.2d at 12; Volkswagenwerk Aktiengesellschaft v. Rickard, 492 F.2d 474, 478 (5th Cir. 1974). In an extreme example of a word taking on meaning from the context of its use, the Court of Customs and Patent Appeals found that the word "stain" connoted a "a state of relative cleanliness"--a meaning contrary to its normal meaning-- when used in connection with a cleaning product, making marks that included "stain" and "clean" similar despite the aural and optical dissimilarity of the marks. See Proctor & Gamble Co. v.

19

Conway, 419 F.2d 1332, 1335-36 (C.C.P.A. 1970) (finding that "Mister Stain" infringed "Mr. Clean").

In this case, we are dealing with a service mark, "The Velvet Elvis," which the Defendants have used at their business location and extensively in advertising. To consider only the Defendants' use of the mark at their business location would ignore highly probative evidence of the meaning of the mark as the public encounters it in commerce and of the Defendants' intent in using the mark. By placing the mark in an Elvis context and in configuring the mark to highlight the "Elvis" portion of the mark, the Defendants have placed the mark in a context that does not alone connote tacky, cheesy art as the district court found. This contrary context of the mark has the ability to alter the psychological impact of the mark and must be considered in determining whether the Defendants' mark creates a likelihood of confusion in relation to EPE's marks. In failing to consider the Defendants' presentation of "The Velvet Elvis" mark to the public in advertising in determining whether the Defendants' use of their mark created a likelihood of confusion, the district court failed to consider the mark as perceived by the public. In addition, by isolating the advertising, the district court failed to consider how the Defendants configured the mark in emphasizing the "Elvis" portion of the name, which is highly probative of the impression they intended to convey.

The fact that the Defendants ceased many of the problematic advertising practices after receiving the cease and desist letter

20

and shortly before EPE filed suit does not make the advertising any less relevant to the question of whether the Defendants' use of the "The Velvet Elvis" mark infringes EPE's marks. The cessation of infringing activity does not affect the determination of liability, but it may make an injunction unnecessary. See M-F-G Corp. v. Emra Corp., 817 F.2d 410, 411 (7th Cir. 1987); see also Blisscraft v. United Plastics Co., 294 F.2d 694, 702 (2d Cir. 1961) (finding it necessary to fully consider the liability issue and issue an injunction despite cessation of infringing use); Esquire, Inc. v. Esquire Slipper Mfg. Co., 243 F.2d 540, 542, 546 (1st Cir. 1957) (reversing a decision dismissing an action based upon the defendant's promise to cease infringing conduct because the plaintiff was entitled to an enforceable judgment). In this case, the district court found "a definite possibility," Elvis Presley Enters., 950 F. Supp. at 803, that the Defendants would resume their infringing advertising practices and therefore granted injunctive relief in spite of the Defendants professed intent to discontinue infringing activities. Ceasing the infringing activity does not allow an infringing party to escape liability. See Spring Mills, Inc. v. Ultracashmere House, Ltd., 689 F.2d 1127, 1133 (2d Cir. 1982).

### b. Parody

As noted earlier, parody is not a defense to trademark infringement, but rather another factor to be considered, which weighs against a finding of a likelihood of confusion. See Dr.

21

Seuss Enters., 109 F.3d at 1405; 4 McCARTHY, supra, § 31-153, at 31-222 to 31-223. As a leading treatise has stated,

> Some parodies will constitute an infringement, some will not. But the cry of "parody!" does not magically fend off otherwise legitimate claims of trademark infringement or dilution. There are confusing parodies and non-confusing parodies. All they have in common is an attempt at humor through the use of someone else's trademark. <u>A non-infringing parody is merely amusing, not confusing.</u>

4 id. § 31:153, at 31-223 (emphasis added); cf. Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 1188 (5th Cir. 1979) (noting that parody is relevant to a fair-use defense to copyright infringement but does not establish the defense). Therefore, while not a defense, parody is relevant to a determination of a likelihood of confusion and can even weigh heavily enough to overcome a majority of the digits of confusion weighing in favor of a likelihood of confusion.

This court has yet to consider parody in relation to trademark law. However, recently in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), the Supreme Court considered parody in the copyright context, which is relevant to the treatment of parody in the trademark context. See Balducci Publications, 28 F.3d at 776; 4 McCARTHY, supra, § 31:153, at 31-222; Gary Myers, Trademark Parody: Lessons from the Copyright Decision in Campbell v. Acuff-Rose Music, Inc., LAW & CONTEMP. PROBS., Spring 1996, at 181. The Campbell Court noted that

> the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works. If, on the contrary, the commentary has no critical bearing on

22

the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger. <u>Parody needs to mimic an original to make its point</u>, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.

510 U.S. at 580-81 (emphasis added and citations and footnotes omitted) (considering parody in relation to the fair-use defense to copyright infringement). From the Supreme Court's statements, it is clear that a parody derives its need and justification to mimic the original from its targeting of the original for comment or ridicule. <u>Id.</u> at 588 ("When parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable."). If the original is not a target of the parody, the need to "conjure up" the original decreases as the parody's aim moves away from the original.[4]

This same need to conjure up the original exists when a parody targets a trademark or service mark. In the case of the standard likelihood-of-confusion analysis, a successful parody of the original mark weighs against a likelihood of confusion because, even though it portrays the original, it also sends the message that it is not the original and is a parody, thereby

---

[4] Justice Kennedy would go further and limit parody's ability to insulate copyright infringement <u>only</u> to circumstances in which the original is a target of the parody. <u>See</u> <u>Campbell</u>, 510 U.S. at 597 (Kennedy, J., concurring).

lessening any potential confusion. See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc., 886 F.2d 490, 494 (2d Cir. 1989) ("A parody must convey two simultaneous--and contradictory--messages: that it is the original, but also that it is not the original and is instead a parody."); see also Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 321 (4th Cir. 1992); 4 MCCARTHY, supra, § 31:155, at 31-235 ("'[T]he joke itself reinforces the public's association of the mark with the plaintiff.'" (quoting Robert C. Denicola, Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols, 1982 WIS. L. REV. 158, 188)). Therefore, a parody of a mark needs to mimic the original mark and from this necessity arises the justification for the mimicry, but this necessity wanes when the original mark is not the target of the parody.

In this case, the district court found that "The Velvet Elvis" mark, when combined with the bar's gaudy decor, was "an integral part of Defendants' parody of the faddish, eclectic bars of the sixties." Elvis Presley Enters., 950 F. Supp. at 792. The intent was to parody "a time or concept from the sixties--the Las Vegas lounge scene, the velvet painting craze and perhaps indirectly, the country's fascination with Elvis." Id. at 795 (emphasis added). In his testimony, Capece stated that the Defendants "were trying to make fun of the Hardrock Cafes, the Planet Hollywoods, or some of the places that were more pretentious" and that the Defendants could successfully perform

24

their parody without using Elvis Presley's name.  This testimony and the district court's analysis both indicate that neither Elvis Presley nor EPE's marks were a target of the Defendants' parody.

The Defendants argue that a parody of society can still parody a celebrity, see Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 972 (10th Cir. 1996) (noting that "a parody of a celebrity does not merely lampoon the celebrity, but exposes the weakness of the idea or value that the celebrity symbolizes in society"), but in Cardtoons, the parody of society was through the parody of the celebrity.  Here, we have a direct parody of society that does not even attempt to parody the celebrity--Elvis Presley.

The Defendants' parody of the faddish bars of the sixties does not require the use of EPE's marks because it does not target Elvis Presley; therefore, the necessity to use the marks significantly decreases and does not justify the use.  Capece himself conceded that the Defendants could have performed their parody without using Elvis's name.  Without the necessity to use Elvis's name, parody does not weigh against a likelihood of confusion in relation to EPE's marks.  It is simply irrelevant. As an irrelevant factor, parody does not weigh against or in favor of a likelihood of confusion, and the district court erred

in relying upon parody in its determination of the likelihood of confusion.[5]

In its likelihood-of-confusion analysis, the district court made determinations on five of the seven digits of confusion which either ignored relevant advertising evidence or relied upon the Defendants' parody of the sixties lounge scene.  These errors have permeated the district court's findings of fact on the likelihood of confusion and on each of those digits of confusion.  Therefore, we will review the likelihood-of-confusion determination and those infected findings on the digits of confusion de novo based upon the well-developed record.  See Balducci Publications, 28 F.3d at 773; Roto-Rooter Corp., 513 F.2d at 46-47.

### 4.    Likelihood of confusion

In our de novo consideration of the likelihood of confusion, we will accept the district court's findings that the identity of retail outlets and purchasers weighs against a likelihood of confusion and that the identity of advertising media is irrelevant.  Neither finding is challenged by the parties nor implicates the district court's errors in isolating the

---

[5] We have considered parody separately from the other digits of confusion and recommend this approach, but in no way do we suggest at this time that the district court's approach of considering parody within its analysis of the standard digits of confusion in itself constitutes reversible error.  But cf. Balducci Publications, 28 F.3d at 773 (finding that the district court's consideration of First Amendment concerns in its likelihood-of-confusion analysis caused it to hold the plaintiff to a higher standard than required to prove trademark infringement).

Defendants' advertising practices from the analysis or in its application of parody; therefore, we leave those findings undisturbed.[6] This acceptance leaves the following digits of confusion for our consideration: (1) the type of mark, (2) the similarity of marks, (3) the similarity of products and services, (4) the Defendants' intent, and (5) actual confusion. We consider each digit of confusion in turn and then weigh them to determine whether a likelihood of confusion exists.

### a. Type of trademark

The type of trademark refers to the strength of the mark. In looking at the strength of the mark, the focus is the senior user's mark. See RESTATEMENT, supra, § 21(d) & cmt. i; 3 MCCARTHY, supra, § 23:19. The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user. RESTATEMENT, supra, § 21 cmt. i; see also Amstar Corp., 615 F.2d at 259.

The Defendants conceded that EPE's marks have "worldwide fame and almost instantaneous recognition," leading the district court to find that EPE's marks are strong. Elvis Presley Enters, 950 F. Supp. at 792. The Defendants do not dispute this on

---

[6] While accepting the district court's findings that the identity of advertising media does not weigh into the likelihood-of-confusion analysis because the parties do not challenge it, we note that EPE advertises nationwide and its licensees distribute products nationwide. Thus the parties' geographic markets do overlap despite the district courts's finding that they operate in different markets. See Elvis Presley Enters., 950 F. Supp. at 795.

appeal.  Rather, the Defendants argue that "The Velvet Elvis" has a different meaning than EPE's marks and that EPE has not shown distinctiveness outside the entertainment industry.  However, these issues are more appropriately considered in relation to other digits of confusion.  EPE's marks are very strong and therefore strongly weigh in favor of a likelihood of confusion.

### b.    Similarity of marks

The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning.  See Jordache Enters., 828 F.2d at 1484; RESTATEMENT, supra, § 21(a); 3 MCCARTHY, supra, § 23:21.  "Even if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant inquiry is whether, under the circumstances of the use," the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated.  RESTATEMENT, supra, § 21 cmt. c.  However, different meanings of otherwise similar marks may overcome a likelihood of confusion that would otherwise result.  See 3 MCCARTHY, supra, §§ 23:26, :28; see also Long John Distilleries, Ltd. v. Sazerac Co., 426 F.2d 1406, 1407 (C.C.P.A. 1970) (finding the marks, "Long John" and "Friar John," to have obvious meanings that are in no way suggestive of one another).  "In determining the meaning and connotation which the trademark projects, it is proper to look to the context of use, such as material on labels,

28

packaging, advertising and the like." 3 MCCARTHY, supra, § 23:26, at 23-61 (citing In re Nationwide Indus., Inc., 6 U.S.P.Q.2d 1882 (T.T.A.B. 1988)); see also Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 503-04 (2d Cir. 1996) (noting the relevance of the placement of the mark next to other dissimilar symbols); discussion supra Part II.A.3.a.

The district court found that "The Velvet Elvis" mark is "symbolic of a faddish art style that belongs to the culture that created it" and that the mark "has no specific connection with [Elvis] other than the coincidence of its use to portray him." Elvis Presley Enters., 950 F. Supp. at 793. The district court made this finding without considering the context into which the Defendants placed their mark. The Defendants used "The Velvet Elvis" mark in advertising that included (1) the image of Elvis Presley; (2) direct references to Graceland and Elvis Presley with phrases such as "The King Lives," "Viva la Elvis," and "Elvis has not left the building"; and (3) the "Elvis" portion of the mark boldly displayed with "an almost unnoticeable 'Velvet' appearing alongside in smaller script." Id. at 789. On one of their menus, the Defendants also advertised "Oscar at The Elvis," an Academy Awards charity benefit to be held at the bar. The context of the Defendants' advertising for the first nine months of operation of the Richmond Avenue location has imbued "The Velvet Elvis" mark with a meaning that directly evokes Elvis Presley, despite any independent meaning the mark might have. Cf. id. at 797 (noting that the Defendants' advertisements in

29

which "Elvis" is emphasized "creat[e] a definite risk that consumers will identify the bar with Presley or EPE" and that advertisements using Elvis's image cause confusion). The Defendants' mark's connection to Elvis is enhanced by the inclusion of "Elvis" in the mark and the Defendants' decision to emphasize the "Elvis" portion of the mark, leaving the "Velvet" portion almost unnoticeable. See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 936 (4th Cir. 1995) (giving greater weight to the dominant or "salient portions" of a mark); Oreck Corp., 803 F.2d at 171 (focussing on "attention-getting" feature in comparing marks); 3 MCCARTHY, supra, § 23:44 (noting that it is proper to give greater effect to the dominant feature of a mark in the comparison). The Defendants' use of the mark outside this suggestive context where the faddish art style connotation might predominate does not counteract the Defendants' deliberate association with Elvis in their advertising. The connotation of the marks are similar, and this digit of confusion therefore weighs in favor of a likelihood of confusion.

### c.    Similarity of products and services

"The greater the similarity between products and services, the greater the likelihood of confusion." Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F.2d 500, 505 (5th Cir. 1980). Direct competition between the parties' services or products is not required in order to find a likelihood of confusion. Professional Golfers Ass'n of Am. v. Bankers Life & Cas. Co., 514

30

F.2d 665, 669-70 (5th Cir. 1975); see also 3 MᴄCᴀʀᴛʜʏ, supra, §§ 24:13-:14.

> One such relationship where this is true exists when the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business product. . . . [T]he deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that it is in some way affiliated with the owner.

World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 488 (5th Cir. 1971), cited in Professional Golfers Ass'n, 514 F.2d at 670. When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection. See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 388 (5th Cir. 1977); 3 MᴄCᴀʀᴛʜʏ, supra, §§ 24:3, :6.

The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand. See Rᴇꜱᴛᴀᴛᴇᴍᴇɴᴛ, supra, § 21(e) & cmt. j. The actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand. Id. cmt. j.; 3 MᴄCᴀʀᴛʜʏ, supra, § 24:19. Consumer perception is the controlling factor. See Dreyfus Fund Inc. v. Royal Bank of Can., 525 F. Supp. 1108, 1119-20 (S.D.N.Y. 1981) (noting that consumer perception controls over the actual intent of the senior user); 3 MᴄCᴀʀᴛʜʏ, supra, § 24:19. "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the

31

market for the type of goods marketed by the subsequent user, confusion may be likely." RESTATEMENT, supra, § 21 cmt. j.

While we recognize that EPE has plans to open a worldwide chain of Elvis Presley restaurants and has opened its Memphis restaurant since the district court's decision, our proper focus is on (1) whether the products and services of EPE and the Defendants are similar enough to cause confusion as to source or affiliation or (2) whether the Defendants' bar is in a market into which EPE would naturally be perceived to expand. The Velvet Elvis serves food, cigars, and alcohol; provides live music; and sells t-shirts and hats. EPE licenses its marks on a wide variety of products, including t-shirts and hats, and the Defendants concede that EPE's marks are particularly strong in the music, television, and movie industries. EPE also operates family-oriented restaurants and an ice cream parlor at Graceland. Despite the breadth of EPE's licensed products, these products and services may not be similar enough to weigh in favor of a likelihood of confusion, but it is a question that we need not reach.

The pervasiveness of EPE's marks across the spectrum of products and the success and proliferation of entertainment and music-themed restaurants like Planet Hollywood and Hard Rock Cafe--which Capece testified inspired their parody--support a likelihood of confusion. Cf. Armco, 693 F.2d at 1161 ("Diversification makes it more likely that a potential customer would associate the nondiversified company's services with the

32

diversified company, even though the two companies do not actually compete."). These restaurants have led the way, and an Elvis Presley restaurant would be a natural next step due to the public's strong familiarity with such restaurants and with Elvis. Given that EPE licenses so many products and is a strong presence in the entertainment business and that Planet Hollywood and Hard Rock Cafe have shown the success and popularity of entertainment and music-themed restaurants, the restaurant and bar business with live music is a natural area of expansion for EPE, and this digit of confusion weighs in favor of a likelihood of confusion.

### d. The Defendants' intent

Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion. Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 597 (5th Cir. 1985) (noting that "'[w]hile evil intent may evidence unfair competition and deception, lack of guile is immaterial'" (brackets in original) (quoting Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245, 1249 (4th Cir. 1970)); RESTATEMENT, supra, § 22 cmt. b; 3 MCCARTHY, supra, § 23:107. If a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion. Amstar Corp., 615 F.2d at 263; RESTATEMENT, supra, § 22 cmt. c. A good-faith intent to parody, however, is not an intent to confuse. Nike, 6 F.3d at 1231 (citing Jordache Enters., 828 F.2d at 1486). If the defendant acted in good faith, then this digit of confusion becomes a nonfactor in the likelihood-of-confusion

33

analysis, rather than weighing in favor of a likelihood of confusion. See Fuji Photo, 754 F.2d at 597-98. However, an innocent intent in adopting a mark does not immunize an intent to confuse in the actual use of the mark. Cf. RESTATEMENT, supra, § 22 cmt. c ("Even if an actor believes in good faith that the copying of another's designation is justified, an inference that confusion is likely may arise from other circumstances that suggest an intent to confuse, such as a failure to take reasonable steps to minimize the risk of confusion.").

The district court found that the Defendants' subjective intent was an intent to parody, rather than an intent to confuse. Based upon this finding, the Defendants' intent would not support a finding of a likelihood of confusion. However, the Defendants' advertisements using the image of Elvis, referencing Elvis, and emphasizing the word "Elvis" in the mark are other circumstances that support an intent to confuse. See Elvis Presley Enters., 950 F. Supp. at 797 (noting that "use of this type of advertisement can only indicate a marketing scheme based on the tremendous drawing power of the Presley name and its ability to attract consumer interest and attention" (emphasis added)). These circumstances increase the risk of confusion and are more than just "a failure to take reasonable steps to minimize the risk of confusion." See RESTATEMENT, supra, § 22 cmt. c. The district court found that Capece's subjective intent in adopting the mark was an intent to parody, but in determining a defendant's intent, evidence of the defendant's actions is highly

34

probative and should be considered.  See Oreck Corp., 803 F.2d at 173 ("[The defendant's] actions speak louder than its words . . . ."); 3 MᴄCᴀʀᴛʜʏ, supra, § 23:113, at 23-216 to 23-217.  The Defendants' use of "The Velvet Elvis" mark in their advertising evidences an intent to market the bar by relying upon the drawing power of Elvis, as found by the district court.  See Elvis Presley Enters., 950 F. Supp. at 797.  Therefore, the facts under this digit of confusion weigh in favor of a likelihood of confusion.

### e.  Actual confusion

Evidence of actual confusion is not necessary to a finding of a likelihood of confusion, but "it is nevertheless the best evidence of a likelihood of confusion."  Amstar Corp., 615 F.2d at 263.  Actual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion.  See 3 MᴄCᴀʀᴛʜʏ, supra, §§ 23:6-:7.  "Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion."  3 id. § 23:6; see also Dr. Seuss Enters., 109 F.3d at 1405 (noting that no sale must be completed to show actual confusion); Mobil Oil Co. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987) (finding liability for initial-interest confusion).  Initial-interest confusion gives the junior user credibility during the early stages of a transaction and can

possibly bar the senior user from consideration by the consumer once the confusion is dissipated.  Id.; 3 MCCARTHY, supra, § 23:6.

EPE presented witnesses who testified that they initially thought the Defendants' bar was a place that was associated with Elvis Presley and that it might have Elvis merchandise for sale. The witnesses all testified that, upon entering and looking around the bar, they had no doubt that EPE was not affiliated with it in any way.  Despite the confusion being dissipated, this initial-interest confusion is beneficial to the Defendants because it brings patrons in the door; indeed, it brought at least one of EPE's witnesses into the bar.  Once in the door, the confusion has succeeded because some patrons may stay, despite realizing that the bar has no relationship with EPE.[7]  This initial-interest confusion is even more significant because the Defendants' bar sometimes charges a cover charge for entry, which allows the Defendants to benefit from initial-interest confusion before it can be dissipated by entry into the bar.  Additionally, the finding by the district court that the Defendants' advertising practices caused actual confusion shows that actual confusion occurred when consumers first observed the mark in commerce.  See Elvis Presley Enters., 950 F. Supp. at 797 (noting that EPE also established actual confusion in relation to advertisements with "The Velvet Elvis" mark in a context connoting Elvis Presley).

---

[7]  One witness who was initially confused stayed and purchased a beer.

An absence of, or minimal, actual confusion, however, over an extended period of time of concurrent sales weighs against a likelihood of confusion.  Id. at 263 (finding no likelihood of confusion based upon concurrent sales over fifteen years with minimal instances of confusion); see also Oreck Corp., 803 F.2d at 173 (finding no likelihood of confusion based upon concurrent sales over seventeen months with no evidence of actual confusion); RESTATEMENT, supra, § 23(2) & cmt. d.  In this case, the lack of complaints is relevant but should have less weight than the district court gave it.  Approximately one year after the Richmond location opened, EPE's suit against the Defendants was reported in the press, and this lessens the weight of the lack of complaints because there would be no reason to complain to EPE if one knows EPE is aware of the possible infringer and has begun legal action.  In the instant case, the lack of complaints is over a thirteen-month period, which is shorter than the periods in Oreck Corp. (seventeen months) and Amstar Corp. (fifteen years), and actual confusion has been shown by the evidence of initial-interest confusion unlike in Oreck Corp.

Based upon the above facts, this digit of confusion weighs in favor of a likelihood of confusion, and this finding is supported by the district court's finding of actual confusion in relation to the Defendants' advertising practices.

### f.    **Weighing the digits of confusion**

After considering the Defendants' advertising practices and dropping parody from the analysis, all five digits of confusion

37

that we considered de novo weigh in favor of a likelihood of confusion, and only the identity of retail outlets and purchasers weighs against a likelihood of confusion.  Giving each digit of confusion its due weight, we find that a likelihood of confusion exists between EPE's marks and the Defendants' use of "The Velvet Elvis" mark.  Therefore, the Defendants have infringed EPE's marks with the use of their service mark, "The Velvet Elvis."[8]

## B.    Defenses

The Defendants argue that EPE is barred from seeking relief for their use of "The Velvet Elvis" mark by the defenses of laches or acquiescence.  They claim that EPE should have known about their use of "The Velvet Elvis" mark in August 1991 when Capece applied for federal registration of the mark because it uses the services of a trademark search firm to aid it in defending its marks.  The Defendants contend that EPE rested on its rights by failing to object when it received actual notice of their conduct by the December 1992 publication of the mark in the

---

[8]  Given that all the remedies that EPE seeks and that were properly preserved below, see infra Part III, are available under its successful claims for trademark infringement, we need not reach its federal trademark dilution claim nor its right of publicity claim under Texas law.

In addition, we reach our decision on the trademark infringement claims without considering the PTO's action in denying EPE's application to register "Elvis" as a service mark in the restaurant and tavern business because of a likelihood of confusion with the Defendants' mark.  Without deciding whether we should or could have taken judicial notice of the action, we note that the PTO's finding of a likelihood of confusion supports our decision here even though the PTO was considering a slightly different circumstance of clearly competing services.  Because we did not need to take judicial notice of the action in reaching our decision, EPE's motion is now moot.

PTO's <u>Official Gazette</u> and by failing to protest the Defendants' use until July 1994 when over $100,000 had been invested in the Richmond Avenue location and customer loyalty had been built up by the use of the mark at the Kipling Street location.

"Laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." <u>Conan Properties</u>, 752 F.2d at 153. A defense of laches has three elements: "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; [and] (3) that undue prejudice resulted from the delay." <u>Armco</u>, 693 F.2d at 1161. The period for laches begins when the plaintiff knew or should have known of the infringement. <u>Id.</u> at 1161-62. Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts. <u>See</u> <u>Conan Properties</u>, 752 F.2d at 151-52. Noninfringing use of a mark is not relevant to a defense of laches. <u>See</u> <u>Mead Johnson & Co. v. Baby's Formula Serv., Inc.</u>, 402 F.2d 19, 22 (5th Cir. 1968) (finding long years of noninfringing use of mark would not establish laches as to a later infringing use).

EPE knew of the Defendants' use of "The Velvet Elvis" mark when it was published in the PTO's <u>Official Gazette</u> in December 1992. The Defendants have not shown that EPE should have known at an earlier time nor shown why employing a search service should have given EPE that knowledge earlier. After the Kipling Street location's closing, no infringing use of the mark was

39

occurring because the mark was not being used in commerce,[9] and the Richmond Avenue location's opening is not relevant to the laches period because it occurred after the Defendants' receipt of the cease and desist letter. Therefore, the period relevant for the application of laches is eight months, beginning in December 1992 and running until July 1993 when the Kipling Street location closed. We do not find that eight months was an inexcusable delay.

Additionally, even if we assume eight months to be an inexcusable delay or that the relevant period of delay should include the period the Richmond Avenue location was open until suit was filed in April 1995,[10] no undue prejudice has been shown as a result of the delay in this case. Capece has conceded that he did not purchase the signs for the Richmond Avenue location until after he received the cease and desist letter from EPE and that he did not need to use Elvis's name in order to parody his intended target of the "faddish, eclectic bars of the sixties." Changing the name of the bar would not have destroyed the investment of capital in the nightclub. Additionally, the short

---

[9] Similarly, the nonuse of the mark during the period while no nightclub was open may also break the period of continuous use required to establish the mark as incontestable under 15 U.S.C. § 1065. See Brittingham v. Jenkins, 914 F.2d 447, 454 (4th Cir. 1990) (finding that a business's closing interrupted the continuous use period even though the mark was still used in business transactions because the mark was not used in conjunction with the sale of goods or services).

[10] By no means do we voice an opinion on whether this type of tacking is ever proper, especially where the period of delay is broken by the mark's not being used in commerce due to a business failure.

period of delay here would not justify finding prejudice on the Defendants' claims of customer goodwill from the earlier location.

"[A]cquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induce[] reliance by the defendant." Conan Properties, 752 F.2d at 153. Other than EPE's silence, the Defendants identify no assurances made by EPE to the Defendants upon which they could have relied. The period of silence relevant to acquiescence would not include any time after the cease and desist letter was sent because EPE explicitly communicated its objection, nor would it include the time while no nightclub was open because permission cannot be inferred from silence in the absence of infringing activity. Cf. Mead Johnson & Co., 412 F.2d at 22. The eight months of silence does not rise to the level of an assurance upon which the Defendants could reasonably rely or by which they could claim to have been induced into reliance.

### III. REMEDIES

EPE appeals the district court's denial of an accounting of profits from the Defendants and its denial of attorneys' fees. Both of these claims were not properly preserved below and are therefore waived. "'It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.'" McGehee v. Certainteed Corp., 101 F.3d 1078, 1080 (5th Cir. 1996) (quoting Branch-Hines v. Hebert, 939 F.2d 1311, 1319 (5th Cir.

41

1991)).  The claims, issues, and evidence are narrowed by the pretrial order, thereby narrowing the trial to expedite the proceeding.  See Flannery v. Carroll, 676 F.2d 126, 129 (5th Cir. 1982); see also Branch-Hines, 939 F.2d at 1319 (finding that the pretrial order asserted the plaintiff's full range of damages); Morales v. Turman, 535 F.2d 864, 867 n.7 (5th Cir. 1976) (noting that a pretrial order can be relied upon to indicate the nature of the relief requested), rev'd on other grounds, 430 U.S. 322 (1977).  Once the pretrial order is entered, it controls the course and scope of the proceedings under Federal Rule of Civil Procedure 16(e), and if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint.  See Valley Ranch Dev. Co. v. FDIC, 960 F.2d 550, 554 (5th Cir. 1992) (citing Flannery, 676 F.2d at 129-30).

In the Joint Pre-Trial Order signed by the parties' counsel, EPE's demand for an accounting of profits is not mentioned, but the Joint Pre-Trial Order does mention EPE's demands for injunctive relief, damages, and attorneys' fees under the Lanham Act, 15 U.S.C. § 1117(a).  Section 1117(a) also provides for the remedy of an accounting of profits and lists it separately from damages.  Therefore, EPE's listing of injunctive relief, damages, and attorneys' fees under the Lanham Act in the Joint Pre-Trial Order does not act to preserve its claim for an accounting of profits, and the issue therefore was waived.

Likewise, EPE has waived its claim for attorneys' fees under the Texas right of publicity statute, TEX. PROP. CODE ANN.

§ 26.013(4) (Vernon Supp. 1998), because EPE never references the Texas statute in its request for attorneys' fees. All references to attorneys' fees in the Joint Pre-Trial Order request attorneys' fees under the Lanham Act, 15 U.S.C. §§ 1051-1127, explicitly or by referencing the Lanham Act's standard for their award. The first request for attorneys' fees under the Texas statute occurs in EPE's brief on appeal; as the availability of attorneys' fees under the Texas statute was never placed before the district court, we will not consider it on appeal.

While an accounting of profits and attorneys' fees are not available to EPE, EPE is entitled to an injunction enjoining the Defendants' use of "The Velvet Elvis" mark based upon the Defendants' infringement of EPE's marks by their use of that mark. See 15 U.S.C. § 1116. We find that enjoining only the activities that have associated the mark with Elvis Presley will not provide EPE with the proper relief.[11] The Defendants' advertising practices over many months imbued "The Velvet Elvis" mark with a meaning directly related to Elvis Presley, which cannot now be erased by altering the context of the mark's use. Because the Defendants have imbued the mark with an infringing meaning, use alone in the future would continue the infringement of EPE's marks. On remand, the district court shall enter the appropriate injunction enjoining the Defendants' use of "The

_____

[11] We state no opinion as to whether "The Velvet Elvis" would have infringed EPE's marks if the mark had never been used in ways that connote Elvis Presley. We recognize that such a circumstance would constitute a closer case, but that it is not the circumstance before us.

43

Velvet Elvis" mark and grant any other appropriate relief. All injunctive relief entered should cover not only the Defendants and those acting in concert with them but also their successors and assigns.

## IV.   CONCLUSION

For the foregoing reasons, we REVERSE the district court's judgment and REMAND this case to the district court to enter judgment for EPE and for further proceedings consistent with this opinion. EPE's motion for this court to take judicial notice of an action of the PTO, which was carried with the appeal, is dismissed as moot.